STATE OF NORTH CAROLINA v. RUSSELL D. WORKMAN, II

STATE OF NORTH CAROLINA v. EDDIE W. SHOFFNER

No. 485A94

(Filed 11 October 1996)

1. **Evidence and Witnesses § 2172 (NCI4th)— opinion by expert—testimony not admissible to show basis**

In a prosecution for the first-degree murders of two grocery store workers wherein defendant presented expert opinion testimony that defendant panicked and did not act voluntarily when he heard two screams inside the grocery store, and that those screams triggered a "robbery/murder script" that did not originate in defendant's mind, testimony that defendant identified the codefendant as the person who implanted the "robbery/murder script" in his mind was not admissible under Rule 705 to show the basis for the expert's opinion and was properly excluded where (1) neither the State nor counsel for the codefendant requested that the witness disclose the basis of his opinion; (2) defendant's self-serving hearsay statements that the "robbery/murder script" was originated by the codefendant were not inherently reliable, particularly since defendant was unavailable for cross-examination by either the State or the codefendant; (3) the substance of defendant's defense that the "robbery/murder script" originated somewhere other than in defendant's own mind was related to the jury; and (4) defendant acknowledged during the trial that the identity of the person who implanted the "script" into defendant's mind was not necessary to explain the expert witness's testimony. Therefore, the joinder of the trials of defendant and the codefendant did not deprive defendant of a fair trial by causing the exclusion of evidence critical to his theory of defense. N.C.G.S. § 8C-1, Rule 705.

**Am Jur 2d, Expert and Opinion Evidence §§ 32 et seq.**

STATE v. WORKMAN

[344 N.C. 482 (1996)]

**2. Evidence and Witnesses § 1217 (NCI4th); Appeal and Error § 155 (NCI4th)— statement by testifying codefendant—no *Bruton* violation—absence of objection**

An officer's rebuttal testimony that the codefendant told the police that defendant had proposed that the two commit a robbery and the codefendant said "Okay" did not violate the rule of *Bruton v. United States*, 391 U.S. 123, where the codefendant had already testified and was available for cross-examination by the defendant. Further, defendant waived appellate review of this testimony by failing to object at trial and to argue specifically that the admission of this testimony constituted plain error. Rule of Appellate Procedure 10(c)(4).

**Am Jur 2d, Evidence §§ 721, 751.**

**Supreme Court's application of rule of *Bruton v. United States* (1968) 391 US 123, 20 L. Ed. 2d 476, 88 S Ct 1620, holding that accused's rights under confrontation clause of Federal Constitution's Sixth Amendment are violated where codefendant's statement inculpating accused is admitted at joint trial. 95 L. Ed. 2d 892.**

**3. Constitutional Law § 343 (NCI4th)— preliminary qualification of jurors—no right of defendant to be present**

Defendant was not deprived of his constitutional right to be present at every stage of his capital trial when prospective jurors were preliminarily sworn, oriented and qualified generally for jury service by a deputy clerk of court outside defendant's presence without regard to any particular case or trial.

**Am Jur 2d, Criminal Law §§ 695, 696, 910 et seq.**

**Validity of jury selection as affected by accused's absence from conducting of procedures for selection and impaneling of final jury panel for specific cases. 33 ALR4th 429.**

**4. Jury § 30 (NCI4th)— prospective jurors—basic qualifications—examination by deputy clerk—absence of challenge to panel**

There was no merit to defendant's assignment of error that N.C.G.S. § 15A-1211(b) was violated because a deputy clerk of court, rather than the trial court, examined the basic qualifications of the prospective jurors in a capital trial where defendant

failed to follow the procedures set out in that statute for challenges to the jury panel and further failed to alert the trial court to the alleged improprieties.

**Am Jur 2d, Jury §§ 100 et seq.**

5. **Arrest and Bail § 93 (NCI4th)— belief defendant in trailer—lawfulness of officers' entry**

Officers had reasonable cause to believe that defendant was inside his trailer at the time they arrived to execute arrest warrants, even though defendant's car was not at the trailer, so that the officers did not make an unlawful entry into the trailer which would require the suppression of a T-shirt and boots observed in plain view and later seized pursuant to a search warrant where a codefendant had previously identified a car parked at the trailer as belonging to defendant; three officers were dispatched to watch the trailer to see if defendant left the trailer while the arrest warrants were obtained; those officers reported that they did not see anyone leave the trailer; and the officers noticed that lights were on in the trailer and heard noises inside the trailer before they entered it. N.C.G.S. § 15A-401(e)(1)(b).

**Am Jur 2d, Arrest §§ 117-120.**

6. **Criminal Law § 339 (NCI4th)— denial of severance— defendants' defenses not antagonistic**

The defenses of defendant Shoffner and his codefendant Workman were not antagonistic in this prosecution for two first-degree murders, and the trial court did not abuse its discretion by denying defendant Shoffner's motion for severance, where both defendants agreed that Workman's hand held the knife used to kill the victims; Workman contended that his ADD, aggravated by alcohol use, rendered his actions involuntary and also rendered him incapable of premeditation and deliberation; and Shoffner contended that Workman took him completely by surprise when he killed the two victims.

**Am Jur 2d, Trial § 170.**

**Antagonistic defenses as ground for separate trials of codefendants in criminal case. 82 ALR3d 245.**

STATE v. WORKMAN

[344 N.C. 482 (1996)]

7. **Evidence and Witnesses § 1134 (NCI4th)— hearsay statement by defendant or codefendant—admission of party opponent—implied admission—*Bruton* rule not violated**

The admission of hearsay testimony by a witness in a prosecution for attempted robbery and two murders that she overheard either defendant or his codefendant state, "I guess we'll just have to rob somebody," did not violate defendant's right of confrontation under the *Bruton* rule because this testimony was admissible under recognized exceptions to the hearsay rule. If the statement was made by defendant, it was competent under N.C.G.S. § 8C-1, Rule 801(d) as an admission of a party opponent; if the statement was made by the codefendant, defendant's acquiescence in the statement rendered it competent as an implied admission under N.C.G.S. § 8C-1, Rule 801(d)(B).

**Am Jur 2d, Evidence §§ 721, 751.**

**Supreme Court's application of rule of *Bruton v. United States* (1968) 391 US 123, 20 L. Ed. 2d 476, 88 S Ct 1620, holding that accused's rights under confrontation clause of Federal Constitution's Sixth Amendment are violated where codefendant's statement inculpating accused is admitted at joint trial. 95 L. Ed. 2d 892.**

8. **Evidence and Witnesses § 1134 (NCI4th)— testimony elicited by codefendant implicating defendant—prior inconsistent statement—*Bruton* rule not violated**

In a prosecution for attempted robbery and first-degree murder wherein a witness testified that she had overheard a conversation between defendants in which one defendant stated that he guessed they would have to rob somebody but that she could not remember which defendant made the statement, a detective's testimony elicited on cross-examination by defendant Workman that the witness had identified defendant Shoffner as the one who made the statement was admissible to show a prior inconsistent statement by the witness relating to a material fact and did not violate the *Bruton* rule.

**Am Jur 2d, Evidence §§ 721, 751.**

**Supreme Court's application of rule of *Bruton v. United States* (1968) 391 US 123, 20 L. Ed. 2d 476, 88 S Ct 1620,**

holding that accused's rights under confrontation clause of
Federal Constitution's Sixth Amendment are violated
where codefendant's statement inculpating accused is
admitted at joint trial. 95 L. Ed. 2d 892.

9. **Evidence and Witnesses § 1134 (NCI4th)— 'expert
witness—statements by codefendant—*Bruton* rule not
violated**

In a prosecution for the murders of two grocery store work-
ers, testimony by the codefendant Workman's mental health
expert that Workman told him that, after hearing two screams, he
panicked and committed the murders was not sufficiently spe-
cific to implicate the defendant Shoffner and thus did not violate
the *Bruton* rule by allowing a codefendant's out-of-court state-
ments incriminating defendant to be presented through the testi-
mony of the codefendant's expert witness.

**Am Jur 2d, Evidence §§ 721, 751.**

**Supreme Court's application of rule of *Bruton v. United
States* (1968) 391 US 123, 20 L. Ed. 2d 476, 88 S Ct 1620,
holding that accused's rights under confrontation clause of
Federal Constitution's Sixth Amendment are violated
where codefendant's statement inculpating accused is
admitted at joint trial. 95 L. Ed. 2d 892.**

10. **Evidence and Witnesses § 771 (NCI4th)— testimony admis-
sible against codefendant—admission against defendant—
new trial not required**

In a prosecution for the murders of two grocery store work-
ers, assuming testimony by the assistant manager of another gro-
cery store that the two defendants were in her store on the after-
noon of the murders and she saw defendant Workman put his
hand inside her pocketbook when she went outside the store was
admissible only as to defendant Workman and was improperly
admitted as to defendant Shoffner, a different result would not
have been reached at trial if this testimony had been excluded
as to defendant Shoffner where he elicited testimony on
cross-examination of the witness that he was not near defend-
ant Workman when Workman put his hand in the witness's
pocketbook.

**Am Jur 2d, Appellate Review §§ 713, 752-754, 759.**

STATE v. WORKMAN

[344 N.C. 482 (1996)]

**11. Criminal Law § 1318 (NCI4th)— capital trial—no *Enmund* violation**

Placing defendant on trial for his life for two first-degree murders when his codefendant actually committed the murders during an attempted robbery did not violate *Enmund v. Florida*, 458 U.S. 782, where defendant was found guilty of two counts of felony murder; the trial court instructed the jury that before it could recommend that defendant be sentenced to death, the State must prove beyond a reasonable doubt that defendant "killed or attempted to kill the victim or intended to kill the victim or intended that deadly force would be used in the course of the felony or was a major participant in the underlying felony and exhibited reckless indifference to human life"; and the jury answered the *Enmund* issue "no" and recommended that defendant be sentenced to life imprisonment for both counts of felony murder.

**Am Jur 2d, Trial §§ 888 et seq.**

**Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting, or fleeing from other offense, and the like—post-*Gregg* cases. 67 ALR4th 887.**

**12. Jury § 232 (NCI4th)— death qualification of jury— constitutionality**

Death qualification of a jury does not result in a guilt-prone jury and does not deny a defendant the right of a fair trial and fair sentencing proceeding.

**Am Jur 2d, Jury §§ 199, 279.**

**13. Criminal Law § 101 (NCI4th)— discovery—defendant's oral statements—sufficient compliance with statute**

Where a witness told police that she overheard a conversation between defendants in which defendant Shoffner said he and defendant Workman were "going up the road to get some money," Workman asked who Shoffner knew up the road that had some money, and Shoffner replied that "I guess we'll just have to rob somebody," the State complied with its discovery obligation under N.C.G.S. § 15A-903(a)(2) to divulge the "substance" of defendant's oral statements when it presented a document to defendant Shoffner which included a statement by him that "We

will have to rob someone." Furthermore, due process did not require the State to disclose any more information about defendant's statements.

**Am Jur 2d, Deposition and Discovery §§ 431 et seq.**

**Right of defendant in criminal case to inspection of statement of prosecution's witness for purposes of cross-examination or impeachment. 7 ALR3d 181.**

14. **Homicide § 266 (NCI4th)— felony murders—attempted robbery—sufficiency of evidence**

The State's evidence was sufficient to support defendant Shoffner's conviction on two counts of felony murder predicated upon the felony of attempted armed robbery where it tended to show that defendants Shoffner and Workman were together the afternoon of the murders; defendant Workman bought a fish fillet knife sometime that afternoon; defendants tried to sell various items for money; one defendant was overheard to say that he guessed they would "just have to rob somebody"; shortly thereafter, both defendants arrived at a grocery store; a witness saw defendants exit the store quickly and, upon entering the store, discovered the bodies of the two persons who had been working in the store; the throats of both victims had been cut with a thin, very sharp knife; the female victim was found in the front of the store clutching her pocketbook to her chest; and the buzzer on the store cash register was sounding and the register was lying on its side.

**Am Jur 2d, Homicide §§ 425-428, 442.**

15. **Evidence and Witnesses § 2051 (NCI4th)— defendant desperate for money—shorthand statement of fact**

Testimony that a defendant on trial for felony murder had tried to sell a vest to the witness and told the witness to borrow the money from his mother "like he might have been desperate for money" was admissible as a shorthand statement of fact.

**Am Jur 2d, Expert and Opinion Evidence §§ 10, 11.**

Appeal as of right by defendants pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of life imprisonment entered by Cornelius, J., at the 24 January 1994 Criminal Session of Superior

STATE v. WORKMAN

[344 N.C. 482 (1996)]

Court, Forsyth County, upon jury verdicts finding defendants guilty of first-degree murder. Heard in the Supreme Court 14 September 1995.

*Michael F. Easley, Attorney General, by John G. Barnwell, Assistant Attorney General, for the State.*

*Danny T. Ferguson for defendant-appellant Workman.*

*J. Clark Fischer for defendant-appellant Shoffner.*

LAKE, Justice.

Defendants were tried jointly and capitally for the first-degree murders of Arthur Lee Drake and Janet Louise Drake. As to defendant Workman, the jury returned verdicts of guilty of first-degree murder of Arthur Drake under the felony murder rule and guilty of first-degree murder of Janet Drake on the basis of premeditation and deliberation. As to defendant Shoffner, the jury returned verdicts of guilty of first-degree murder of Arthur Drake under the felony murder rule and guilty of first-degree murder of Janet Drake under the felony murder rule. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended both defendants be sentenced to life imprisonment for each murder conviction. The trial court accordingly sentenced each defendant to two consecutive terms of life imprisonment. We find no prejudicial error, and therefore, we uphold defendants' convictions and sentences.

The State's evidence tended to show that at approximately 8:00 p.m. on 12 June 1993, Stephan Poplin went to Carlton's Grocery on West Clemmonsville Road in Forsyth County to buy some snacks. As Poplin drove into the parking lot, he noticed two men walk quickly from the store, get into an older model Monte Carlo and drive away. The driver stared at Poplin, and Poplin later identified him as defendant Workman. Inside the store, Poplin found seventy-one-year-old Arthur Drake lying on his side with blood all around him, his throat cut. Poplin ran to the store counter to call for help and discovered sixty-three-year-old Janet Drake lying on the floor behind the store counter. Her throat had also been cut, and her pocketbook was pulled close to her body.

Dr. Patrick Lantz, a forensic pathologist, performed autopsies on the Drakes. Mrs. Drake suffered a large incised wound from the left side of her neck to just below her right ear. She also had stab wounds below her left collarbone, on her upper back, on her lower neck and

on her back below her rib cage. Mrs. Drake further suffered two defensive wounds on her hands. Mr. Drake "had a very large gaping wound going [a]cross the front of his neck, going back all the way through his windpipe and his voice box and severing the blood vessels on the right side." He also suffered a stab wound on his left upper back. From the nature of the incised wounds across the necks of Mr. and Mrs. Drake and the minimal amount of bruising present, Dr. Lantz determined that the object used to kill the Drakes "was very sharp" and "fairly thin," consistent with injuries caused by a fish fillet knife.

Crime Scene Specialist W.F. Lemons performed luminol and phenolphthalein testing inside Carlton's Grocery. The testing revealed two separate sets of bloody shoe prints. One set had a clearly defined heel and toe and, in Lemons' opinion, was made by cowboy boots; this set of prints led from Mr. Drake's body to Mrs. Drake's body. Luminol and phenolphthalein testing also revealed the presence of human blood on the driver's side of defendant Workman's blue Monte Carlo and on the inside panel of the passenger side of the car an inch above the back seat. Testing further revealed the presence of human blood on a green and white T-shirt with marijuana leaves depicted on it and bearing the aphorism, "This Bud's For You," and on a pair of cowboy boots; both were seized from defendant Workman's trailer. The blood on defendant Workman's T-shirt was confirmed by DNA analysis to be from Mr. Drake. No blood was detected on the black Harley Davidson T-shirt, black vest and tennis shoes given to police by defendant Shoffner.

Defendant Workman and defendant Shoffner spent the day of the murders riding around in defendant Workman's blue Monte Carlo and making several stops during the course of the afternoon and early evening. At some point in the afternoon, defendants went to Ford's Fishing Center, where defendant Workman bought a fish fillet knife. At approximately 5:50 p.m., defendants arrived at Village Cue & Pub. Julie Stanley, the bartender, testified that when she asked defendant Workman if he wanted another drink, he replied that they were "running short on money." Stanley further testified that the defendants left Village Cue & Pub shortly before 7:00 p.m. and that they were not drunk. After leaving Village Cue & Pub, the defendants stopped at a yard sale. Janet Terry testified that as defendants were leaving the yard sale, she overheard defendant Shoffner say that they were "going up the road to get some money." Both defendants got inside the Monte Carlo, and Terry, who could not identify at trial which defendant was speaking, heard one defendant say, "Who do you know up the

road that has some money?" The other defendant replied, "I don't know anybody. I guess we'll just have to rob somebody."

Between 7:00 and 7:30 p.m., defendants stopped at Hampton's Grocery, where they played pinball. The assistant manager of the store, Diana Stewart, went outside to sweep. Upon reentering the store, she saw defendant Workman with his hand inside her pocketbook; defendant Workman jerked his hand back when he heard Stewart's approach. Defendants then left and drove away in the direction of Carlton's Grocery. Shortly before 8:00 p.m., several people noticed a dark-colored Monte Carlo in the vicinity of Carlton's Grocery.

The day after the murders, defendant Shoffner voluntarily gave a statement to the police and turned over the black vest, black T-shirt and tennis shoes he had worn the day before. Defendant Shoffner told police that he and defendant Workman had been out riding around in defendant Workman's blue Monte Carlo. During the course of the day, they made several stops. The last stop they made was at Carlton's Grocery. Defendant Shoffner told police, and later testified at trial, that he went inside to buy some cigarettes and was standing at the front of the store by the counter with Mrs. Drake when he heard what sounded like water hitting the floor. Defendant Shoffner turned around and saw Mr. Drake fall to the floor and "blood going everywhere." Both defendant Shoffner and Mrs. Drake screamed, and defendant Workman came from the back of the store and began to stab Mrs. Drake. Defendants left the store and drove away quickly. While they were in the car, defendant Workman told defendant Shoffner to throw the fish fillet knife out the window; defendant Shoffner picked up the knife by the tip and threw it out. Defendant Shoffner showed police where he had thrown the knife, and a search team later recovered it. Further, defendant Shoffner took police to defendant Workman's trailer, identified the blue Monte Carlo parked in front of the trailer as belonging to Workman and stated it was the car the two were driving the day before.

Defendant Workman did not testify on his own behalf. Other facts necessary to the development of the issues in this appeal will be presented where relevant.

## ISSUES RAISED BY DEFENDANT WORKMAN

In his first assignment of error, defendant Workman argues that the trial court erred by granting the State's motion for joinder and by

denying his motions for severance made prior to trial and during trial. Specifically, defendant Workman argues (1) that joinder of defendants' trials resulted in the exclusion of evidence critical to his theory of defense, and (2) that joinder of defendants' trials resulted in the admission of prejudicial evidence that could not have been offered had he been tried separately. We disagree.

Charges brought separately against two or more defendants may be joined when the offenses charged:

1. Were part of a common scheme or plan; or

2. Were part of the same act or transaction; or

3. Were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others.

N.C.G.S. § 15A-926(b)(2)(b)(1) to (3) (1988). While public policy is strongly in favor of consolidation, *State v. Nelson*, 298 N.C. 573, 260 S.E.2d 629 (1979), *cert. denied*, 446 U.S. 929, 64 L. Ed. 2d 282 (1980), a motion for joinder must nevertheless be denied whenever it is "necessary to . . . a fair determination of the guilt or innocence of . . . [a defendant]." N.C.G.S. § 15A-927(c)(2)(a) (1988). The decision to join cases for trial rests within the sound discretion of the trial court, and "[a]bsent a showing that a defendant has been deprived of a fair trial by joinder, the trial [court's] discretionary ruling on the question will not be disturbed." *Nelson*, 298 N.C. at 586, 260 S.E.2d at 640. Defendant concedes that joinder in this case was permissible under the statute. We must therefore determine whether the decision by the trial court to join defendants' trials deprived defendant Workman of a fair trial.

[1] First, defendant Workman argues that joinder of defendants' trials deprived him of a fair trial by excluding evidence critical to his theory of defense. Specifically, he argues that the trial court erred by refusing to allow his expert witness, Dr. Frank Wood, to testify that Workman had related, in an interview session, that on the day of the murder, it was defendant Shoffner who implanted a "robbery/murder script" in defendant Workman's mind.

On direct examination, Dr. Wood testified that, in his opinion, Workman suffered from attention deficit disorder ("ADD"). Defendant Workman then attempted to elicit testimony from Dr. Wood regarding an "event that occurred within the store that [Dr.

Wood] found significant to [his] diagnosis." The State and defendant Shoffner objected, and the jury was sent out of the courtroom.

Dr. Wood testified on *voir dire* that defendant Workman told him that defendant Shoffner suggested that they rob an establishment using the fish fillet knife and that "if you rob a place, you can't have any witnesses." Dr. Wood further testified that defendant Workman rejected this idea. However, according to Dr. Wood, the screams of Shoffner and Mrs. Drake, and particularly defendant Shoffner's scream, acted as a "triggering mechanism," causing defendant Workman to believe the robbery was taking place. In Dr. Wood's opinion, the combination of defendant Workman's ADD, aggravated by alcohol use, defendant Shoffner's scream and the "robbery/murder script" implanted in defendant Workman's mind by defendant Shoffner, rendered Workman unable to exercise any self-control and unable to plan or reflect upon his actions when he killed Mr. and Mrs. Drake.

Following much discussion between the parties and the trial court, the court ruled:

THE COURT: . . . [Dr. Wood] may testify as to the screams without attributing them to anybody and he may testify as to robbery being in his mind, Mr. Workman's mind . . . .

. . . .

THE COURT: And then to his opinion and his opinion may deal with . . . Workman's mental state, his mental processes and also his impulses and whether or not he would have self-control under those findings.

Before the jury, Dr. Wood testified, in part, as follows:

Q. Did you learn of something that occurred in the store when [defendant Workman] walked into the store that had an effect on him?

A. Yes. Not when he walked in, after he had walked in and gone to the back.

Q. Okay. And what was that?

A. That he heard two screams.

Q. And what effect, in your opinion, did that have on [defendant Workman's] mind when he heard those screams.

A. I believe they made him panic and I believe that the reason they made him panic is that . . . they made him think that the robbery had started.

[DEFENSE COUNSEL FOR SHOFFNER]: Objection. Move to strike, Your Honor.

THE COURT: Sustained. Members of the jury, disregard the last statement by the witness.

Q. In your opinion, after [defendant Workman] heard the scream, what occurred in [his] mind?

A. He panicked, in my opinion, and at that point was under such heavy arousal from that panic that he was unable to control himself and act voluntarily.

Q. And how did the scream play into that—into this arousal and his ability to control himself?

A. It triggered an idea, an image, I would even say a script which had been deposited —

[DEFENSE COUNSEL FOR SHOFFNER]: Objection.

A. —in his mind —

THE COURT: Overruled.

A. —and the idea was to the effect that if stores get robbed, witnesses have to be —

[DEFENSE COUNSEL FOR SHOFFNER]: Objection. Motion to strike, Your Honor.

THE COURT: Overruled.

A. I'm not sure I got to finish.

Q. Okay. Please finish your answer.

A. The idea being that if stores do get rob[bed], witnesses have to be killed.

Q. And in your opinion, do you have an opinion as to whether or not this idea originated in [defendant Workman's] mind?

A. Yes.

Q. And what is your opinion?

A. My opinion is that that idea did not originate in [defendant Workman's] mind.

From this evidentiary record, it is clear defendant Workman was able to present testimony from Dr. Wood to the jury to the effect that defendant Workman panicked and did not act voluntarily when he heard two screams inside Carlton's Grocery. Further, Dr. Wood was able to testify that these screams triggered a "robbery/murder script" that did not originate in defendant Workman's mind. The only evidence the jury was not permitted to hear was that defendant Workman identified defendant Shoffner as being the person who implanted the "robbery/murder script" in his mind. Defendant Workman, however, contends that the identity of the person responsible for implanting the "robbery/murder script" in his mind is admissible under Rule 705 of the North Carolina Rules of Evidence.

Rule of Evidence 705 provides that an expert may testify regarding his or her opinion without first disclosing "the underlying facts or data, unless an adverse party requests otherwise . . . . The expert may in any event be required to disclose the underlying facts or data on cross-examination." N.C.G.S. § 8C-1, Rule 705 (1992). This Court has previously recognized that "Rule 705 does not . . . make the bases for an expert's opinion automatically admissible." *State v. Baldwin,* 330 N.C. 446, 456, 412 S.E.2d 31, 37 (1992). "Only if an adverse party requests disclosure must the trial court require the expert to disclose the underlying facts of his opinion." *Id.*

It is clear that the trial court's decision excluding the basis of Dr. Wood's opinion was correct. First, neither the State nor counsel for defendant Shoffner requested that Dr. Wood disclose the basis of his opinion. Second, defendant Workman's self-serving hearsay statements that the "robbery/murder script" was originated by defendant Shoffner were not inherently reliable, particularly since defendant Workman had informed the trial court that he would not testify on his own behalf and, therefore, was unavailable for cross-examination by either the State or defendant Shoffner. *See Baldwin,* 330 N.C. at 457, 412 S.E.2d at 37-38 (psychological expert not allowed to testify regarding the substance of any self-serving, exculpatory statements made by the defendant during interviews unless or until the defendant testifies regarding matters relating to those statements). Third, the exclusion of Dr. Wood's basis for his opinion did not deprive defendant of the full force of his defense. As the portions of Dr. Wood's testimony reproduced above amply demonstrate, the jury

heard the complete substance of Workman's defense. The crux of Workman's defense, that the "robbery/murder script" originated somewhere other than defendant Workman's own mind, was relayed to the jury. Finally, defendant Workman himself acknowledged during the trial that the identity of the person who actually implanted the "script" into defendant's mind was not necessary to explain Dr. Wood's testimony when he stated, "[T]he doctor doesn't have to say where [the script] came from, but it's crucial, Judge, that he says it didn't originate with [defendant Workman.]" We therefore hold that the trial court did not abuse its discretion by excluding evidence regarding the identity of the person responsible for implanting the "robbery/murder script" in defendant Workman's mind.

[2] Finally, defendant Workman contends that joinder of defendants' trials resulted in the admission of prejudicial rebuttal evidence that could not have been offered had he been tried separately.

Defendant Shoffner testified on his own behalf that he had no intent to rob anyone on the day of the murders. The State responded with the rebuttal testimony of Detective Randall Pitts, who indicated that the day after the murders, when defendant Shoffner made his statement to police, he stated that Workman had proposed that the two commit a robbery, and Shoffner said, "Okay." Defendant Workman contends this rebuttal testimony was received in violation of *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476 (1968), which prohibits the admission of incriminating statements made by nontestifying codefendants.

We note first that this testimony was offered by the State in rebuttal. At that point in the trial, codefendant Shoffner had already testified and was available for cross-examination by codefendant Workman. *Bruton* therefore does not apply in this instance.

Further, Rule 10 of the Rules of Appellate Procedure provides that in order to preserve a question for appellate review, a party must make a timely objection. *See* N.C. R. App. P. 10(b)(1). Defendant Workman did not voice an objection, on any grounds, to the elicited testimony he now contends was improper and prejudicial; thus, he has failed to preserve this issue for appellate review. "Even alleged errors arising under the Constitution of the United States are waived if defendant does not raise them in the trial court." *State v. Jaynes*, 342 N.C. 249, 263, 464 S.E.2d 448, 457 (1995), *cert. denied*, —— U.S. ——, 135 L. Ed. 2d 1080 (1996). Defendant Workman has waived appellate review of this issue by failing specifically and distinctly to argue

**STATE v. WORKMAN**

[344 N.C. 482 (1996)]

plain error as required by Rule 10(c)(4) of the Rules of Appellate Procedure.

Accordingly, we overrule defendant Workman's first assignment of error.

**[3]** In his second assignment of error, defendant Workman contends he was deprived of his constitutional right to be present during a stage of his capital trial. This constitutional deprivation, according to defendant Workman, arises from the fact that various venires of jurors were preliminarily sworn, oriented and qualified generally for jury service by a deputy clerk of court in a jury assembly room outside defendant Workman's presence. Defendant Workman notes further that no court reporter was present during these "proceedings" to record the events as they transpired.

The Confrontation Clause in Article I, Section 23 of the North Carolina Constitution "guarantees an accused the right to be present in person at every stage of his trial." *State v. Payne*, 320 N.C. 138, 139, 357 S.E.2d 612, 612 (1987). "This right to be present extends to all times during the trial when anything is said or done which materially affects defendant as to the charge against him." *State v. Chapman*, 342 N.C. 330, 337-38, 464 S.E.2d 661, 665 (1995), *cert. denied*, —— U.S. ——, 135 L. Ed. 2d 1077 (1996). A defendant's right to be present during all stages of his capital trial is a nonwaivable right, *Payne*, 320 N.C. at 139, 357 S.E.2d at 612, and we have imposed a duty upon the trial court to insure a defendant's presence throughout the trial, *id.* The violation of this right is subject to a harmless error beyond a reasonable doubt standard of review. *State v. Huff*, 325 N.C. 1, 381 S.E.2d 635 (1989), *sentence vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990).

The record reveals, and defendant Workman himself acknowledges in his brief on this point, that defendant Workman's case was called for trial 24 January 1994. It is quite clear that defendant Workman was present when jury selection began for his trial:

[DEFENDANT WORKMAN'S COUNSEL]: Oh, one other matter, Your Honor. During jury selection when the time comes for the lawyers to introduce themselves, we would . . . like to let our client stand up and introduce himself to the jury. Does the [c]ourt have any problem with that?

THE COURT: Yes, I do. The [c]ourt will be introducing all parties.

Any other matters? Well, due to the time, only about 15 minutes before the lunch break, I think we'll wait and start at two o'clock and have the jurors brought up at that time and begin the jury selection process at that point rather than bring them up here and send them to lunch.

Does everyone agree with that?

[DEFENDANT SHOFFNER'S COUNSEL]: Yes, Your Honor.

THE COURT: Any other matters before we take the lunch recess? Okay. The court will be in recess until two o'clock.

(A noon recess was taken.)

(The defendants are present in the courtroom.)

(The prospective jurors were brought into the courtroom.)

THE COURT: I'd like to extend a welcome to those of you who are here for jury service. We're very pleased to have you here this afternoon. Very shortly we're going to begin the jury trial of a couple of criminal cases and these cases are being consolidated for one trial . . . and I'm going to be talking to you a little bit about the cases and you need to listen very carefully.

Defendant's right to be present at all stages of his trial does not include the right to be present during preliminary handling of the jury venires before defendant's own case has been called. *See State v. Rannels*, 333 N.C. 644, 430 S.E.2d 254 (1993); *State v. Cole*, 331 N.C. 272, 415 S.E.2d 716 (1992). Defendant Workman had no right to be present when prospective jurors were preliminarily sworn, oriented and qualified for jury service in general, without regard to any particular case or trial. Further, because defendant Workman's trial had not yet commenced, these "proceedings" could not have been conducted during a stage of defendant Workman's capital trial.

[4] Defendant Workman further argues under this assignment of error that N.C.G.S. § 15A-1211(b) was violated because a deputy clerk of court, rather than the trial court, allegedly examined the basic qualifications of the prospective jurors. It is true that the trial court "must decide all challenges to the panel and all questions concerning the competency of jurors." N.C.G.S. § 15A-1211(b) (1988). However, this statute further provides that while a defendant may make a challenge to the jury panel, the challenge:

(1) May be made only on the ground that the jurors were not selected or drawn according to law.

(2) Must be in writing.

(3) Must specify the facts constituting the ground of challenge.

(4) Must be made and decided before any juror is examined.

N.C.G.S. § 15A-1211(c). In the case *sub judice*, defendant Workman never followed this specific procedure. Indeed, the record reflects that defendant never challenged the jury panel selection process and never once voiced to the trial court any objection to the allegedly improper handling of the jury venires prior to the call of his case for trial before a jury. In light of the fact that defendant failed to follow the procedures clearly set out for jury panel challenges and further failed, in any manner, to alert the trial court to the alleged improprieties, we hold this portion of this assignment of error is without merit. This assignment of error is overruled.

[5] Lastly, defendant Workman argues the trial court erred in denying his motion to suppress the admission of cowboy boots, a T-shirt and blue jeans seized from defendant Workman's trailer.

Defendant Workman filed a pretrial motion to suppress this evidence, arguing that police entry into his trailer to effectuate his arrest was unlawful as it was allegedly made without reasonable cause to believe he was present inside the trailer as required by N.C.G.S. § 15A-401(e)(1)(b). The trial court concluded as a matter of law that officers had probable cause to believe that defendant was inside the trailer and that the entry into the trailer was not in violation of defendant Workman's constitutional rights. The trial court further concluded as a matter of law that the discovery of the cowboy boots and the T-shirt was the result of Detective Pitts seeing them in plain view, that Detective Pitts had a right to be in the trailer after making a lawful entry and that their discovery was inadvertent. Therefore, the trial court denied defendant's motion to suppress those items. The trial court did, however, grant defendant's motion to suppress as to the blue jeans. We find no error in the trial court's denial of defendant's motion to suppress with regard to the cowboy boots and T-shirt.

Entry into a private premises by police in order to make an arrest is governed by N.C.G.S. § 15A-401(e)(1) and (2). This statute provides in part:

(1) A law-enforcement officer may enter private premises or a vehicle to effect an arrest when:

    a. The officer has in his possession a warrant or order for the arrest of a person or is authorized to arrest a person without a warrant or order having been issued,

    b. The officer has *reasonable cause to believe the person to be arrested is present*, and

    c. The officer has given, or made reasonable effort to give, notice of his authority and purpose to an occupant thereof, unless there is reasonable cause to believe that the giving of such notice would present a clear danger to human life.

(2) The law-enforcement officer may use force to enter the premises or vehicle if he reasonably believes that admittance is being denied or unreasonably delayed, or if he is authorized . . . to enter without giving notice of his authority and purpose.

N.C.G.S. § 15A-401(e)(1), (2) (1988) (emphasis added). In the present case, defendant Workman only argues that the trial court's conclusion that officers had reasonable cause to believe defendant Workman was inside the trailer was erroneous. Defendant Workman argues that because his car was not at the trailer when officers arrived to execute the arrest warrant, the officers did not have reasonable cause to believe defendant Workman was inside the trailer. We disagree.

The trial court's findings of fact provide ample evidence from which to conclude that the officers had reasonable cause to believe defendant Workman was inside his trailer when they entered. The trial court found as fact that defendant Shoffner met with Detective Pitts and made statements implicating himself and defendant Workman in the attempted robbery of Carlton's Grocery. Defendant Shoffner stated that defendant Workman cut the throats of both victims. Defendant Shoffner led Detective Pitts to the approximate area where the knife used in the murders was thrown, and it was recovered. Defendant Shoffner took Detective Pitts down a dead-end road and pointed out defendant Workman's trailer; defendant Shoffner identified a blue Monte Carlo parked in front of the trailer as belonging to defendant Workman. Detective Pitts dispatched three officers to defendant Workman's trailer with instructions to stay out of sight and to watch the road to see if defendant Workman left in his car. Detective Pitts and Detective Millard Shepherd then obtained an

arrest warrant for defendant Workman on two counts of first-degree murder. At approximately 11:30 p.m., after obtaining the arrest warrant, officers noticed that lights were on inside the trailer; although Detective Pitts did not notice defendant Workman's car, the officers sent by Detective Pitts to watch the trailer indicated that they did not observe anyone leave the trailer. As Detective Pitts approached the trailer, he heard noises inside. After waiting approximately three minutes after the officers' presence and purpose were announced, officers entered the trailer. While looking for Workman, Detective Pitts observed, in plain view, a pair of cowboy boots and a T-shirt with blood on them. Detective Pitts then secured a search warrant for the trailer.

Under these facts and circumstances, the officers had reasonable cause to believe that defendant Workman was inside his trailer at 11:30 p.m. on a Sunday night, when lights were on inside the trailer and noises were heard inside. Further, no officer stationed outside the trailer, for the express purpose of watching the trailer to see if Workman left, saw anyone leave. Based upon the trial court's findings of fact, it properly concluded that the officers did not make an unlawful entry into the trailer requiring suppression of the T-shirt and cowboy boots seen in plain view and later seized pursuant to a search warrant. Accordingly, this assignment of error is overruled.

## ISSUES RAISED BY DEFENDANT SHOFFNER

[6] In his first assignment of error, defendant Shoffner also argues that the trial court erred by granting the State's motion for joinder and by denying his motions for severance made prior to trial and during trial. Specifically, defendant Shoffner argues that the trial court abused its discretion by denying his motions to sever because his defense and the defense of defendant Workman were in direct conflict and, therefore, antagonistic.

In *State v. Pickens*, 335 N.C. 717, 440 S.E.2d 552 (1994), we stated:

The existence of antagonistic defenses will not, standing alone, warrant a severance. *State v. Lowery*, 318 N.C. 54, 59, 347 S.E.2d 729, 734 (1986). On the other hand, the fact that the evidence may be substantial against a defendant will not preclude severance where joinder denies a defendant a fair trial. "The test is whether the conflict in defendants' respective positions at trial is of such a nature that, considering all of the other evidence in the case, defendants were denied a fair trial." *Lowery*, 318 N.C. at

59, 347 S.E.2d at 734, quoting *Nelson,* 298 N.C. at 587, 260 S.E.2d at 640.

*Pickens,* 335 N.C. at 725, 440 S.E.2d at 556 (citations omitted). Based upon our review of the transcript, we cannot agree with defendants' characterization of their defenses as antagonistic.

Defendant Workman's defense at trial was twofold. First, he argued he was not criminally responsible for premeditated and deliberated murder because he suffered from ADD, aggravated by alcohol use, which rendered his actions involuntary. Workman contended that a "robbery/murder script," that "when places get robbed, witnesses have to be killed," had been implanted in his mind and that when he heard two screams inside Carlton's Grocery, the combination of his ADD and the "robbery/murder script" caused him to panic; his actions became automatic and he killed Mr. Drake. Defendant Workman did not deny that he also killed Mrs. Drake, although he presented evidence that he had no memory of the events regarding her murder. Alternatively, defendant Workman contended that even if he was in control of his actions on the night of the murder, his ADD rendered him completely incapable of premeditation and deliberation. Defendant Shoffner's defense, on the other hand, was simply that defendant Workman took him completely by surprise when Workman killed Mr. and Mrs. Drake.

Neither defendant pointed a finger toward the other and claimed the other was the actual killer. Rather, both defendants quite harmoniously agreed that defendant Workman's hand held the knife used to kill the victims. Under these circumstances, we conclude that these defenses are wholly different, not irreconcilable and not antagonistic. *Cf. Pickens,* 335 N.C. at 728, 440 S.E.2d at 558-59 (error to deny defendant's motion to sever where each defendant presented antagonistic evidence that the other defendant, or some other third party, was the actual shooter).

**[7]** Defendant Shoffner further argues he suffered prejudicial error from the consolidation of his trial with defendant Workman's trial. First, defendant Shoffner contends that the testimony of Janet Terry was inadmissible under *Bruton,* which prohibits the admission of incriminating statements made by nontestifying codefendants.

"The holding of *Bruton* is based on the right of a litigant to confront the witnesses against him. Consequently, if testimony is admitted under the hearsay rule, or as an exception to it, there is no right

of confrontation[,] and *Bruton* does not prohibit the use of such testimony." *State v. Willis*, 332 N.C. 151, 167, 420 S.E.2d 158, 165 (1992). While *Bruton* involved the in-custody confession of a nontestifying codefendant, we have applied its holding to the extrajudicial admissions, or statements, of a nontestifying codefendant. *See, e.g., State v. Spaulding*, 288 N.C. 397, 219 S.E.2d 178 (1975), *death sentence vacated*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976); *State v. Jones*, 280 N.C. 322, 185 S.E.2d 858 (1972).

Janet Terry testified at trial that she overheard defendant Shoffner say that he and defendant Workman were "going up the road to get some money." Terry, who could not identify at trial which defendant was speaking, next heard one defendant say, "Who do you know up the road that has some money?" The other defendant replied, "I don't know anybody. I guess we'll just have to rob somebody."

We conclude this testimony was properly admitted under recognized exceptions to the general prohibition against the admission of hearsay testimony, and thus, no violation of *Bruton* occurred in this instance. If defendant Shoffner was the defendant who said, "I guess we'll just have to rob somebody," this statement was properly admitted, as it is a statement of a party opponent and admissible under Rule 801(d) of the North Carolina Rules of Evidence, which provides for the admission of a statement "if it is offered against a party and it is . . . his own statement." N.C.G.S. § 8C-1, Rule 801(d) (1992). Further, if defendant Shoffner was the one who asked, "Who do you know up the road that has some money?" then his acquiescence in defendant Workman's response that he guessed they would have to rob someone was an implied admission and properly admitted under Rule of Evidence 801(d)(B). *See id.; State v. Hardy*, 293 N.C. 105, 235 S.E.2d 828 (1977) (a statement made in a person's presence under such circumstances that the person would naturally be expected to deny the statement if it is untrue is admissible as an implied admission and is not barred by *Bruton*). Terry's testimony concerning the conversation she overheard between defendants was properly admitted at trial, as the statements, though hearsay, fell under well-recognized exceptions to the rule barring hearsay. Because no right to confrontation exists when testimony is admitted as an exception to the hearsay rule, the holding of *Bruton* was not violated.

[8] Defendant Shoffner further contends under this assignment of error that defendant Workman's cross-examination of Detective Pitts

concerning Janet Terry's trial testimony was improperly admitted. During the police investigation of the Drakes' murders, Detective Pitts interviewed Terry about the conversation she overheard between defendants. In this interview, Terry identified defendant Shoffner as the defendant who said, "I guess we'll just have to rob somebody." At trial, however, Terry testified she could not remember which defendant made this statement.

"Inconsistent prior statements are admissible for the purpose of shedding light on a witness's credibility," *State v. Whitley*, 311 N.C. 656, 663, 319 S.E.2d 584, 589 (1984), and when the "prior statement relates to material facts in the witness's testimony, extrinsic evidence may be used to prove the prior inconsistent statement," *id.* We have defined material facts as those facts relating to matters "pertinent and material to the pending inquiry." *Id.* In the present case, the cross-examination of Detective Pitts demonstrating Terry's prior inconsistent statement was proper extrinsic evidence of a material fact. This information was a vital portion of the State's case against both defendants, as it demonstrated that defendants had discussed a robbery shortly before the murders at Carlton's Grocery. As such, it constitutes a material fact within the context of this particular trial. We conclude that the cross-examination on this point was properly admitted, without violating *Bruton*, as it showed a prior inconsistent statement made by Terry.

[9] Defendant Shoffner next argues that certain out-of-court statements made by defendant Workman were improperly admitted through the testimony of defendant Workman's expert witness, Dr. Wood, and that these statements incriminated defendant Shoffner in violation of *Bruton*. Specifically, defendant Shoffner contends that Dr. Wood should not have been allowed to testify that after hearing two screams, defendant Workman allegedly panicked and committed the murders. By this testimony, defendant Shoffner asserts defendant Workman "was allowed to state through his surrogate, Dr. Wood, that [defendant] Shoffner planned the Carlton's robbery and physically assaulted Mrs. Drake."

We disagree that the testimony given by Dr. Wood was sufficiently specific to actually implicate defendant Shoffner. Dr. Wood's testimony did not identify defendant Shoffner, or any other person, as having screamed. Further, we disagree that the plain inference from the screams was that defendant Shoffner had attacked Mrs. Drake at the front of the store. Defendant Shoffner himself testified that he

and Mrs. Drake screamed, but that they screamed after, and because, defendant Workman had attacked Mr. Drake with the fish fillet knife. By this testimony, it is apparent that defendant Shoffner had no objection at trial to the jury hearing evidence that defendant Shoffner was in fact one of the people who screamed inside Carlton's Grocery. We further note that defendant Shoffner declined, once after Dr. Wood's direct examination and again after his redirect examination, to question Dr. Wood concerning any aspect of the testimony he gave in front of the jury. Based upon the circumstances as developed at trial, we conclude *Bruton* was not violated by the admission of Dr. Wood's' testimony in this regard.

**[10]** Defendant Shoffner further proposes that he was improperly "tainted" by evidence received under Rule of Evidence 404(b), which evidence defendant Shoffner contends was admissible only as to defendant Workman. At trial, the State called Diana Stewart, assistant manager of Hampton's Grocery. Stewart testified that defendants were inside the store playing pinball the afternoon of the murder. Stewart went outside to sweep and saw defendant Workman walk "straight to my pocketbook and he was sticking his hand inside my pocketbook." Stewart opened the door to come back inside, and when the bell on the door sounded, defendant Workman pulled his hand out of Stewart's pocketbook.

During cross-examination of Stewart, defendant Shoffner elicited testimony from her that he was not near defendant Workman when Workman put his hand in Stewart's pocketbook. In light of this cross-examination, even assuming the admission of this testimony as to defendant Shoffner was prejudicial, we nevertheless conclude there is no reasonable possibility that had the testimony not been received, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1988).

**[11]** Finally, defendant Shoffner argues he should not have been placed on trial for his life pursuant to *Enmund v. Florida*, 458 U.S. 782, 73 L. Ed. 2d 1140 (1982), in that "forcing him to trial before a death-qualified jury, when the evidence against him was both quantitatively and qualitatively different from his codefendant who was the undisputed murderer, unfairly increased his chances of conviction."

In *Enmund*, the United States Supreme Court held that the Eighth Amendment forbids the imposition of the death penalty on a defendant "who aids and abets a felony in the course of which a mur-

der is committed by others . . . [when the defendant] does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797, 73 L. Ed. 2d at 1151. In *Tison v. Arizona*, 481 U.S. 137, 95 L. Ed. 2d 127 (1987), the Court refined the holding in *Enmund* and stated that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Tison*, 481 U.S. at 158, 95 L. Ed. 2d at 145.

Defendant Shoffner was found guilty of two counts of felony murder. At his capital sentencing proceeding, conducted in accord with N.C.G.S. § 15A-2000, the trial court instructed that before the jury could recommend that defendant Shoffner be sentenced to death, the State must prove beyond a reasonable doubt that "the defendant Eddie Wayne Shoffner killed or attempted to kill the victim or intended to kill the victim or intended that deadly force would be used in the course of the felony or was a major participant in the underlying felony and exhibited reckless indifference to human life." This instruction is in full accord with *Enmund* and *Tison*, as well as with the pattern jury instructions. *See* N.C.P.I.—Crim. 150.10 (1995). The record further reflects that the jury answered the *Enmund* issue, submitted on the Issues and Recommendation as to Punishment form as to both counts of felony murder as Issue One-A, "no." The jury, following its instructions, accordingly recommended that defendant Shoffner be sentenced to life imprisonment for both counts of felony murder. We detect no hint of error in the trial court's instructions or the jury's procedure in this regard.

[12] As to defendant Shoffner's argument that his risk of conviction was unfairly increased because he was tried before a death-qualified jury, we rejected this argument in *State v. Kirkley*, 308 N.C. 196, 302 S.E.2d 144 (1983), *overruled on other grounds by State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988), when we held that death-qualifying a jury does not result in a guilt-prone jury and does not deny a defendant the right to a fair trial and fair sentencing proceeding. Defendant Shoffner advances no reason why we should depart from our prior precedent regarding this issue; accordingly, this assignment of error, in its entirety, is overruled.

[13] In his second assignment of error, defendant Shoffner contends it was error for the trial court to allow Janet Terry to testify when the State allegedly failed to provide defendant Shoffner with Terry's statements as required by N.C.G.S. § 15A-903(a)(2). Defendant Shoffner

also proposes that his right to due process was infringed by the alleged discovery violation.

The criminal discovery statute in question, N.C.G.S. § 15A-903(a)(2), requires the State, upon motion by a defendant, "[t]o divulge, in written or recorded form, the substance of any oral statement relevant to the subject matter of the case made by the defendant." N.C.G.S. § 15A-903(a)(2) (1988). The State is required to "divulge the substance of the statement no later than 12 o'clock noon, on Wednesday prior to the beginning of the week during which the case is calendared for trial." *Id.* "Determining whether the State failed to comply with discovery is a decision left to the sound discretion of the trial court." *State v. Jackson*, 340 N.C. 301, 317, 457 S.E.2d 862, 872 (1995). A "trial court is not required to impose any sanctions for abuse of discovery orders." *State v. Weeks*, 322 N.C 152, 171, 367 S.E.2d 895, 906 (1988).

Janet Terry told police that she overheard a conversation between defendants in which defendant Shoffner said he and defendant Workman were "going up the road to get some money." Defendant Workman said, "Who do you know up the road that has some money," and defendant Shoffner replied, "I don't know anybody. I guess we'll just have to rob somebody." On 10 September 1993, the State presented defendant Shoffner with a document setting out the substance of oral statements made by defendant Shoffner; statement number nine contained the following statement: "We will have to rob someone." Although defendant Shoffner concedes there is no general obligation on the part of the State to provide the names of witnesses prior to trial, *see State v. Harris*, 323 N.C. 112, 371 S.E.2d 689 (1988), he appears to contend that the State's discovery response "was both inherently misleading and inadequate to satisfy" the State's discovery obligation because nothing more concerning the conversation Terry overheard was divulged. We cannot agree. N.C.G.S. § 15A-903(a)(2) only requires the State to divulge the "*substance*" of a defendant's oral statement. This the State did. "Defendant was not entitled to a description of the facts and circumstances surrounding these statements." *Harris*, 323 N.C. at 122, 371 S.E.2d at 695. We conclude the trial court did not err in determining that the State had fully complied with its discovery obligations in this instance. We further conclude that due process did not, in this case, require the State to disclose any more information than it did, and this assignment of error is overruled.

STATE v. WORKMAN

[344 N.C. 482 (1996)]

**[14]** In another assignment of error, defendant Shoffner argues it was error for the trial court to deny defendant Shoffner's motion to dismiss the two first-degree murder charges against him on the grounds of insufficiency of the evidence. Because the jury found defendant Shoffner guilty of two counts of first-degree murder solely on the theory of felony-murder, premised upon the felony of attempted robbery with a dangerous weapon, we do not address defendant Shoffner's contention that there was insufficient evidence upon which the jury could have found him guilty of premeditated and deliberated murder.

"Felony murder is a murder committed in the perpetration or attempted perpetration of certain felonies including those committed or attempted with the use of a deadly weapon." *State v. Cook*, 334 N.C. 564, 570, 433 S.E.2d 730, 733 (1993); *see* N.C.G.S. § 14-17 (1993). Attempted robbery with a dangerous weapon is the unlawful attempt to take personal property from another or in another's presence by the use or threatened use of a firearm or other dangerous weapon which threatens or endangers the life of another. *See* N.C.G.S. § 14-87(a) (1993); *State v. Allison*, 319 N.C. 92, 352 S.E.2d 420 (1987). In order to gain convictions against both defendants, particularly with respect to defendant Shoffner, the State proceeded under the theory of concerted action. "A defendant may properly be found guilty of first-degree felony murder where he knowingly engages in the commission of a dangerous felony and where a killing takes place." *State v. Reese*, 319 N.C. 110, 145, 353 S.E.2d 352, 372 (1987).

We have set forth the law governing motions to dismiss countless times:

> "If there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied." *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988). Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion. The evidence must be viewed in the light most favorable to the State, and the State must receive every reasonable inference to be drawn from the evidence. Any contradictions or discrepancies arising from the evidence are properly left for the jury to resolve and do not warrant dismissal.

*State v. King*, 343 N.C. 29, 36, 468 S.E.2d 232, 237 (1996) (citations omitted).

The evidence at trial tended to show that defendant Workman and defendant Shoffner were together the afternoon of the Drakes' murders. Numerous witnesses testified regarding defendants' attempts to sell various items for money. Another witness testified that one of the defendants stated that they were "running short on money." Yet another witness testified that she overheard defendant Shoffner say that he and defendant Workman were "going up the road to get some money." This witness then heard one of the defendants say, "Who do you know up the road that has some money?" To which the other defendant replied, "I don't know anybody. I guess we'll just have to rob somebody." Shortly thereafter, both defendants arrived at Carlton's Grocery. Stephan Poplin witnessed the defendants' quick exit from the store. Upon entering the store, Poplin heard the buzzer on the cash register sounding and noticed that the register was lying on its side. Mrs. Drake was found in the front of the store clutching her pocketbook to her chest. Both victims' throats had been cut with a thin, very sharp knife. Defendant Workman had purchased a fish fillet knife that very afternoon.

Viewing this evidence in the light most favorable to the State and drawing all reasonable inferences in its favor, we conclude the evidence against defendant Shoffner was sufficient for the jury's consideration and determination. From the evidence, the jury could reasonably infer and find as fact that defendants Workman and Shoffner needed money; "went up the road" to rob the grocery store; and during the course of the robbery, murdered the Drakes. The trial court, therefore, did not err by denying defendant Shoffner's motion to dismiss. This assignment of error is overruled.

[15] In his last assignment of error, defendant Shoffner argues that he was prejudiced by Chad Viars' allegedly improper cross-examination testimony. The cross-examination at issue transpired, in part, as follows:

Q. How hard was Shoffner trying to sell this vest to you?

A. He just—he made—Shoffner made the request "Borrow the damn money from your mom" *like he might have been desperate for money.*

(Emphasis added.) Defendant Shoffner objected and moved to have the testimony stricken. The trial court overruled the objection and denied the motion to strike. Defendant contends Viars' testimony that

he "might have been desperate for money" was irrelevant under Rule of Evidence 401 and was highly prejudicial under Rule of Evidence 403.

We conclude, however, that Viars' testimony was admissible as a short-hand statement of fact. *See, e.g., State v. Hunt,* 325 N.C. 187, 381 S.E.2d 453 (1989) (witness testimony that defendant responded to a coconspirator's remarks with "a long glance like he had better shut up" admissible as a shorthand statement of fact); *State v. Dawson,* 278 N.C. 351, 180 S.E.2d 140 (1971) (witness testimony that defendant "seemed to be joking about it" was admissible as a shorthand statement of fact). "Opinion evidence is always admissible when the facts on which the opinion or conclusion is based cannot be so described that the jury will understand them sufficiently to be able to draw their own inferences." 1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 178 (4th ed. 1993). The weight to give Viars' testimony that defendant Shoffner "might have been desperate for money" was for the jury to decide. Even assuming error as to this particular statement, we conclude defendant Shoffner still would not be entitled to relief. Other evidence tended to show defendant Shoffner needed money the day of the murder, *e.g.,* he pawned a microwave. Further, he was overheard participating in a conversation with defendant Workman in which one or the other stated they would have to go up the road and rob somebody. There is no reasonable possibility that absent this one remark by Viars, the result of the trial would have been different. N.C.G.S. § 15A-1443(a). This assignment of error is overruled.

In conclusion, having carefully reviewed the record and each of defendants' assignments of error, we hold that defendants received a fair trial, free of prejudicial error.

NO ERROR.