STATE OF NORTH CAROLINA v. CHARLES L. PICKENS, JR., AND JAMES EDWARD ARRINGTON

No. 121A92

(Filed 4 March 1994)

**Criminal Law § 338 (NCI4th) — murder — defendants joined for trial — motion to sever — erroneously denied — antagonistic defenses**

The trial court erred in a prosecution for first-degree murder and discharging a firearm into occupied property by denying defendants' motion to sever where various joinder-driven evidentiary rulings, and the exchanges that occurred between defendants related to these rulings, demonstrate that the joinder of these defendants for trial yielded an evidentiary contest more between the defendants themselves than between the State and the defendants. Given the conflict in defendants' respective positions at trial and considering the other evidence in the case, including the paucity of evidence on acting in concert, a severance was necessary to promote a fair determination of defendants' guilt or innocence. N.C.G.S. § 15A-927(c)(2).

**Am Jur 2d, Trial § 21.**

**Antagonistic defenses as ground for separate trials of codefendants in criminal case. 82 ALR3d 245.**

Defendants appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of life imprisonment entered by Rousseau, J., at the 30 September 1991 Criminal Session of

Superior Court, Buncombe County. Heard in the Supreme Court 15 October 1993.

> *Michael F. Easley, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

> *Robert W. Clark and Curtiss A. Graham, Assistant Public Defenders, for defendant-appellant Pickens.*

> *David G. Belser for defendant-appellant Arrington.*

FRYE, Justice.

Defendants were indicted on 7 May 1990 for first-degree murder and discharging a firearm into occupied property. The State's motion for joinder was allowed on 13 April 1991. Defendants were tried capitally and found guilty of all charges. On the first-degree murder charge, the jury rejected a theory of premeditation and deliberation and found both defendants guilty based on a theory of felony murder. The trial court determined that there was insufficient evidence of any aggravating circumstances and therefore no capital sentencing proceeding was held. Each defendant was sentenced to life imprisonment for first-degree murder, and judgment on the underlying felony was arrested as to each defendant.

Both defendants bring forth numerous assignments of error on appeal. We find merit in defendants' assignments of error regarding their joinder for trial. We therefore remand this case to the trial court for new and separate trials for each defendant.

The State's evidence at trial tended to show the following facts and circumstances: On 24 March 1990, Tereca Stewart, the nine-year-old daughter of Karen Robinson, was killed by a large caliber bullet while she was inside apartment 18-B of the Erskine Street Apartments in Asheville. Karen Robinson had been the longtime girlfriend of defendant Arrington, who lived with her and her three children, including Tereca, in apartment 4-A of the same housing complex. Karen married Darryl Cannady two weeks after the shooting. Defendant Arrington is the half-brother of defendant Pickens whose father, Charles Pickens, Sr., lived in apartment 6-A of the Erskine Street Apartments.

On 24 March defendant Arrington and Karen Robinson were having an argument which continued over the course of several hours. Meisha Cannady, Darryl Cannady's niece, testified that she

went with Karen and a group of friends and relatives to the magistrate's office where Karen and Meisha's grandmother, Gloria Cannady, secured assault and trespass warrants against Arrington. The group returned to apartment 4-A and began moving Arrington's property out of the apartment. Arrington arrived and told everyone but Karen to leave. A fight ensued between defendant Arrington and Darryl Cannady, and the others left apartment 4-A and went to apartment 18-B where Meisha's grandmother lived. As Meisha left, she ran into defendant Pickens who was entering apartment 4-A with a gun in his hands. As Meisha was running up the hill toward apartment 18-B, she heard two gunshots. Meisha entered apartment 18-B, followed by Darryl and Karen. The other members of the group were already in 18-B, along with Karen's children and Karen's sister's children. Shortly thereafter, Meisha heard two shots come through the window of apartment 18-B and saw Tereca fall after being shot in the head. Meisha testified that she saw defendant Arrington outside one of the windows of apartment 18-B.

Darryl Cannady testified that defendant Arrington came to apartment 18-B, where Darryl lived with his mother, Gloria Cannady, at about 6:30 p.m. on 24 March. Arrington was arguing with Karen and twice slammed her to the ground. The police were called and Arrington ran down the hill, stating that he would be back. Darryl testified that the police advised Karen and Gloria Cannady to secure assault and trespass warrants, which they did. Later that day, Darryl went with several others to apartment 4-A to help move Arrington's belongings out of the apartment. When the group arrived at 4-A, Darryl borrowed a rifle from Anita Chambers and checked the apartment to make sure Arrington was not there. Darryl returned the rifle to Anita who stood outside the apartment watching for defendant Arrington. Arrington came to the apartment and ordered everyone out; he had a gun, a knife and some nunchakus. Arrington began assaulting Karen and swung the nunchakus at Darryl; Darryl and Arrington began fighting. Defendant Pickens entered the apartment with a .22 caliber rifle and broke up the fight when he pointed the rifle at Darryl and told him to get off Pickens' brother. Darryl ran out of the apartment. Darryl testified that Pickens fired at him twice as he (Darryl) ran up the hill toward apartment 18-B. As Darryl was fleeing, he heard Arrington ask for Pickens' gun; Pickens tell Arrington to "get the .9 millimeter"; and Arrington say, "I got it." Darryl saw Arrington and Pickens outside apartment 18-B and then two shots came through the window, one hitting Tereca.

Ramona Gilliam, Karen's sister, and her three children were in the group that went with Karen to the magistrate's office, to apartment 4-A, and then into 18-B to flee the fighting. Gilliam testified that once inside apartment 18-B, she saw both defendants approach the apartment and saw an automatic weapon in Arrington's hands but could not see Pickens' hands. About two to three minutes later, she heard shots and Tereca was hit.

Stanley Aiken testified that on the evening of 24 March, he and defendant Arrington were sitting in the park near the apartments talking. Arrington asked Aiken to see if Karen was in 18-B, which Aiken did. About forty-five minutes later, as Aiken was looking out the window of apartment 18-A, where he lived, he heard some shots and saw defendant Pickens running up the hill with a gun. Aiken also stated that he saw Monica Pickens, defendant Pickens' sister, behind Pickens as Pickens was firing into 18-B.

Rosetta Boseman testified that she lived in apartment 20-B and that, on the evening of 24 March, she heard Monica Pickens yelling from the bottom of the hill at Gloria Cannady who was trying to dissuade Calvin Cannady from going down to protect his brother Darryl. Half an hour later, Boseman saw defendant Pickens coming across the street with a gun; he walked by her window and fired toward Building 18.

Karen Robinson Cannady testified that on 24 March she had an argument with defendant Arrington over her allegedly "seeing" Darryl Cannady. Arrington followed her from apartment 4-A to 18-B and, once inside, was using profanity and was asked to go outside by Gloria Cannady. Arrington and Karen went outside where Arrington slammed Karen to the ground three times. Karen reentered the apartment and someone called the police. The police advised her to secure a warrant for assault which she did that afternoon. Karen then returned to her apartment and began removing Arrington's personal property. Arrington returned to apartment 4-A and assaulted Karen but she was able to get away when Darryl Cannady intervened. She ran to apartment 18-B and shortly thereafter saw Arrington outside the front window. Karen heard him say, "I'm coming in, I'm coming in." She then heard gunshots and saw her daughter wounded.

Detective Walt Robertson testified that he arrived at apartment 4-A and observed defendant Arrington leaning against an automobile; Arrington had blood on his face and shirt and his right

eye was swollen. Detective Robertson was about to enter apartment 4-A when people arrived screaming that a child had been shot at 18-B. He proceeded to apartment 18-B, followed by Sergeant Tom Aardema. After a warning from Aardema to get down, Robertson looked back and saw defendant Pickens running behind him and then disappearing. Shortly thereafter, Robertson saw a black and gray Oldsmobile exit the apartment complex and called for assistance to stop the automobile. Although unable to stop the automobile at that time, Robertson later identified the driver as defendant Pickens.

Sergeant Ross Robinson participated in the investigation of this case. He testified that in apartment 18-B he observed two bullet holes in the front window, a bullet lodged in the kitchen window frame and a bullet hole beside the window. He found a .22 caliber rifle in a closet. Fingerprints on the rifle were identified as belonging to Anita Chambers. Tests performed on the .22 rifle indicated that the bullet recovered from 18-B could not have been fired by the .22 rifle found in that apartment. Gunshot residue tests performed on both defendants were inconclusive.

An autopsy performed on Tereca Stewart revealed the cause of death to be extensive brain damage caused by a bullet larger than a .22 caliber—one that would have been consistent with a .9 millimeter projectile.

Nineteen witnesses testified for defendant Arrington. Fireman Charles Biddix testified to arriving at the scene at 9:10 p.m. and finding defendant Arrington walking out of apartment 4-A. Arrington was bleeding from a cut above his eye and appeared to have been drinking. Other firemen also testified to treating Arrington. Fireman Jeff Anders testified that he thought he heard a gunshot after arriving on the scene.

Sergeant Tom Aardema testified that he ran up the hill from apartment 4-A to 18-B to assist Detective Robertson. He heard people in the crowd yell, "That's him, that's him, that's the shooter!" Aardema yelled for Robertson to get down and aimed his weapon at a person Robertson later identified as defendant Pickens. Pickens disappeared, but shortly thereafter Aardema saw a gray Oldsmobile go by and heard people screaming, "That was him!"

Anna Galloway, who lived at apartment 14-A, testified that she arrived home by car between 8:45 and 9:15 p.m. on 24 March

and saw Arrington outside Building 4 holding his head. She drove on to her apartment and heard some cursing as she got out of the car. She then saw defendant Pickens run up the hill and heard him say, "That m----- f---- ain't going to f-- with my brother." She then heard two shots but did not see anyone shoot.

Detective Kevin West testified that he responded to the call to apartment 18-B. He helped carry Darryl Cannady out to the ambulance and Darryl told him that defendant Pickens had done the shooting. On cross-examination by defendant Pickens, Detective West testified that Calvin Cannady told him that defendant Arrington shot into the apartment.

Alice Ryans, sister of both defendants, testified next for Arrington. Ryans testified that after hearing on a scanner that Arrington had been shot, she went to apartment 6-A where Charles Pickens, Sr., lived. Once there, she received a telephone call from defendant Pickens, who wanted his father to go out onto the porch and get a "carton of cigarettes" from under a lawnmower. Monica Pickens went to the lawnmower and returned with a .9 millimeter gun which Ryans identified in court. Monica gave the gun to defendant Pickens' father who left the house with it. Later that night, Ryans went to the magistrate's office and spoke with defendant Pickens who told her that he did not know the little girl was in the apartment and that he did not mean to shoot her. The next day, Ryans reported this conversation to Detective Robertson.

Michael Arrington, cousin of both defendants, testified that Harold Ervin brought the .9 millimeter gun to him at Michael Arrington's house in May of 1990. Ervin gave Arrington the gun and Arrington gave him $150 for it. Defendant Pickens' father was outside in the car when this transaction took place. Michael Arrington pawned the gun to one of his friends but later retrieved it and gave it to defendant Arrington's attorney. S.B.I. analysis indicated that the .9 millimeter bullet recovered from the window frame of apartment 18-B was fired by this same .9 millimeter gun.

Defendant Pickens offered the following evidence: Charlie Mae Pickens, sister of both defendants, testified that from apartment 6-A where she lived, she saw Anita Chambers going into apartment 4-A with a handgun and a long gun. She told defendant Pickens what she saw and the two of them then went to apartment 4-A and observed the fight between Darryl Cannady and defendant Arrington. They returned to 6-A where Pickens retrieved a gun

and went back to 4-A. Pickens broke up the fight by pointing the gun at Cannady and telling him to "get off my brother now or I'll shoot." Charlie Mae Pickens testified that she saw Darryl run up the street and heard gunshots after Darryl was out of sight. After hearing the shots, she saw Pickens in his father's car calling to get help for Arrington who was lying on the hood of the car at that time. Pickens drove away in his father's car but returned three or four minutes later. She also testified that her sister Alice Ryans was never in her family's apartment with her that night, and that she only saw Ryans at the police station.

Pickens' sister, Monica Pickens, testified that on the evening of 24 March she was at apartment 6-A with Arrington drinking bourbon and that she told him to leave. Two minutes later, Monica heard two shots and saw Anita Chambers coming out of an apartment with a long gun and a pistol. Monica ran to defendant Pickens and told him that defendant Arrington had been shot. Pickens picked up a long gun from under the couch in 6-A and he and Monica went to 4-A. Monica saw defendant Pickens hold the shotgun on Darryl Cannady and tell him to get off defendant Arrington. Darryl ran away and defendant Pickens used the car telephone to call the police. Monica then heard two shots and she and Pickens ran across the street and looked up the hill. They heard people saying there was a shooting so she and Pickens returned to 4-A where paramedics were treating defendant Arrington. Monica denied ever having seen the .9 millimeter gun and denied having retrieved it from the lawnmower on the porch of apartment 6-A.

Pickens' girlfriend, Renatta Yon, testified that she was in apartment 6-A and heard Monica ask Arrington to leave and then heard a couple of shots two minutes later. She went to 4-A after the fight ended and saw defendant Pickens go to the telephone to call 911. Yon testified that she saw defendant Pickens and Monica Pickens help Arrington to the car. Yon saw defendant Pickens use the telephone and then heard two or three shots while defendants were both still near the car at the bottom of the hill. Yon testified that she was at 6-A the entire night and never saw Alice Ryans nor a handgun there.

Raymond Curtis testified that on 24 March he lived in apartment 20-C and saw defendant Arrington beating Karen. Arrington left and Curtis heard him say he would be back. Later, Curtis saw Arrington coming toward the playground and then fire a pistol

two or three times toward the building next to 20-C. Pickens was about thirty feet behind Arrington and had nothing in his hands. On cross-examination by Arrington, Curtis admitted he was partially blind but stated that this condition occurred after the date of the homicide. Defendant Pickens' objections to further cross-examination of Curtis by defendant Arrington regarding Curtis' medical condition were sustained by the trial court.

Both defendants presented rebuttal evidence tending to challenge the credibility of each others witnesses. The State offered no rebuttal evidence.

Both defendants assign as error the trial court's denial of their motions to sever. Both defendants contend that their defenses were antagonistic and each contends that the joint trial deprived him of a fair trial. Pickens' defense was that he was at the lower end of the apartment complex calling 911 when the shots were fired into apartment 18-B. Arrington's defense was that he was disabled from the fight in apartment 4-A and was waiting at the lower end of the complex for an ambulance when the shots were fired. Each defendant contends that it was the other defendant who fired the shots that killed Tereca Stewart and that they were not acting in concert.

Defendants filed motions to sever prior to trial. These motions were denied and the State's motion for joinder was allowed. Both defendants renewed their motions to sever at various times throughout the trial and these motions were also denied. Both defendants identify numerous evidentiary rulings which they contend resulted in the denial of a fair trial for each of them.

N.C.G.S. § 15A-926(b)(2)(a) provides for joinder of defendants where, as here, the State seeks to hold each defendant accountable for the same offenses. The propriety of joinder depends upon the circumstances of each case and is within the sound discretion of the trial judge. "Absent a showing that a defendant has been deprived of a fair trial by joinder, the trial judge's discretionary ruling on the question will not be disturbed." *State v. Nelson*, 298 N.C. 573, 586, 260 S.E.2d 629, 640 (1979), *cert. denied sub nom. Jolly v. North Carolina*, 446 U.S. 929, 64 L. Ed. 2d 282 (1980). Nevertheless, under N.C.G.S. § 15A-927(c)(2) the trial court must deny a joinder for trial or grant a severance of defendants whenever it is necessary to promote a fair determination of the guilt or innocence of one or more defendants.

STATE v. PICKENS

[335 N.C. 717 (1994)]

The existence of antagonistic defenses will not, standing alone, warrant a severance. *State v. Lowery*, 318 N.C. 54, 59, 347 S.E.2d 729, 734 (1986). On the other hand, the fact that the evidence may be substantial against a defendant will not preclude severance where joinder denies a defendant a fair trial. *See State v. Boykin*, 307 N.C. 87, 296 S.E.2d 258 (1982); *State v. Alford*, 289 N.C. 372, 222 S.E.2d 222, *death penalty vacated sub nom. Carter v. North Carolina*, 429 U.S. 809, 50 L. Ed. 2d 69 (1976). "The test is whether the conflict in defendants' respective positions at trial is of such a nature that, considering all of the other evidence in the case, defendants were denied a fair trial." *Lowery*, 318 N.C. at 59, 347 S.E.2d at 734, quoting *Nelson*, 298 N.C. at 587, 260 S.E.2d at 640.

As we said in *Nelson*:

Prejudice would ordinarily result where codefendants' defenses are so irreconcilable that 'the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' *Rhone v. United States*, 365 F. 2d 980, 981 (D.C. Cir. 1966). Severance should ordinarily be granted where defenses are so discrepant as to pose an evidentiary contest more between defendants themselves than between the state and the defendants. *See* ABA Standards Relating to Joinder and Severance 41 (Approved Draft 1968). To be avoided is the spectacle where the state simply stands by and witnesses 'a combat in which the defendants [attempt] to destroy each other.' *People v. Braune*, 363 Ill. 551, 2 N.E. 2d 839, 842 (1936).

*Nelson* at 587, 260 S.E.2d at 640.

Each defendant contends that various "joinder-driven" evidentiary rulings resulted in the admission or exclusion of evidence to the prejudice of one or the other defendant. We find merit in defendants' arguments and conclude that these rulings, and the exchanges that occurred between defendants related to these rulings, demonstrate that the joinder of these defendants for trial yielded an evidentiary contest "more between defendants themselves than between the state and the defendants," and that defendants were thereby denied a fair trial. *See Nelson*, 298 N.C. at 587, 260 S.E.2d at 640. Several of the trial court's rulings are worthy of note since they tend to illustrate the prejudice to defendants of a joint trial.

First, defendant Pickens' failure to testify in his own defense was based on the position taken by his codefendant rather than the position taken by the State. Defendant Pickens filed a motion *in limine* indicating that he intended to testify and requesting that he not be cross-examined regarding five specific prior convictions. The State agreed. Defendant Arrington however, stated that he would not make a similar agreement and that he intended to cross-examine Pickens fully about each of those convictions. As a result of defendant Arrington's position, Pickens did not testify. Pickens was thereby denied the opportunity to present evidence which he would have been able to present in a separate trial, based on the State's position taken at this trial. *See Boykin,* 307 N.C. at 92, 296 S.E.2d at 261 (new and separate trials granted where in joint trial defendant was denied the opportunity to introduce evidence which would have explained his earlier admissions); *Alford,* 289 N.C. at 387-88, 222 S.E.2d at 232 (new trial where joint trial deprived defendant of evidence—his codefendant's statement—which would have corroborated his alibi testimony).

Secondly, defendant Pickens was denied the opportunity to put on potentially inculpatory evidence against his codefendant. On direct examination, defendant Pickens questioned Karen Cannady about threats defendant Arrington had made against her and her children. Arrington objected to this line of questioning based on relevancy and a *voir dire* was held. On *voir dire,* Karen testified that on the day of the murder Arrington had grabbed the victim, scratched her in the chest and cursed at her. Karen also testified that Arrington told her that if she left him he would kill her and her children. Karen's mother, Priscilla Harris, testified that she had witnessed Arrington making threats to Karen and the children prior to and on the day of the murder. Defendants examined and cross-examined these two witnesses extensively on *voir dire* regarding the admissibility of this evidence. The State did not participate in this *voir dire* except to object that a question had been asked and answered. The trial judge eventually inquired as to the State's position and the prosecutor responded that the evidence was relevant. Nevertheless, the trial judge excluded the evidence stating that it was not relevant to prove intent or motive.

Apart from the issues of relevance and admissibility of this evidence, defendant Pickens was denied the opportunity to present this evidence to the jury based on the objection of his codefendant Arrington. If the State maintained its position in a separate trial

between the State and defendant Pickens this evidence, in all likelihood, would have been admitted. It is, of course, possible that in a separate trial the State would have objected to the admission of this evidence. That possibility, however, highlights the extent to which this joint trial involved an evidentiary battle between defendants where the State stood by and allowed the defendants to attempt to destroy each other. *See Nelson*, 298 N.C. at 587, 260 S.E.2d at 64.

Defendant Arrington also identifies numerous instances of his proffered evidence being excluded based solely on the objection of his codefendant. For example, Arrington attempted to cross-examine Darryl Cannady in regards to a previous incident where defendant Pickens shot another person with the same .22 caliber rifle he fired at Darryl Cannady and an incident where Pickens shot into the window of a building. Defendant Pickens, and not the State, objected to this cross-examination. A *voir dire* was then held on the admissibility of this evidence at which the State did not question the witness and expressed no opinion regarding the admissibility of the evidence. The trial court sustained defendant Pickens' objections and ruled the evidence inadmissible.

These and other evidentiary disputes reflect the conflict between defendants that characterized this joint trial. It is clear from the evidence in this case that someone fired into apartment 18-B, killing Tereca Stewart. Based on the evidence presented at trial, in order for the jury to have found both defendants guilty of felony murder it was necessary that the jury find that both defendants either discharged a firearm into 18-B or acted in concert with someone who did. The conflict in the evidence arises on three critical issues: (1) the presence of either or both defendants outside 18-B; (2) the identity of the person(s) firing into 18-B; and (3) whether, if either defendant did not fire into 18-B, that defendant was acting in concert with the person who did fire into the apartment.

The State called six witnesses who testified to the involvement of one or both defendants in this homicide. Karen Cannady, the victim's mother, and Meisha Cannady, Darryl Cannady's niece, testified that they each saw defendant Arrington outside the window of apartment 18-B before shots were fired. Darryl Cannady testified that he saw both defendants outside the window of apartment 18-B before shots were fired. Ramona Gilliam, Karen Cannady's sister, testified that she saw both defendants coming up the hill

and that defendant Arrington had a gun. Stanley Aiken, who lived in apartment 18-A, saw defendant Pickens coming up the hill and shooting into apartment 18-B. Rosetta Boseman, who lived in apartment 20-B, saw defendant Pickens coming across the street with a gun which he fired three times in the direction of 18-B.

Thus, at the close of the State's evidence, there was conflicting testimony as to who was outside the window of apartment 18-B. Two witnesses saw defendant Arrington, two witnesses saw defendant Pickens, and two witnesses saw both defendants. One State's witness, Stanley Aiken, saw yet a third person, Monica Pickens, in the area when shots were fired into 18-B. Only one of these witnesses saw either defendant actually fire into 18-B. There was also very little evidence of acting in concert.

Defendants proceeded to offer evidence, each presenting witnesses who testified that the other defendant or some other person was outside apartment 18-B and did the shooting. Defendant Pickens called his sisters Charlie Mae Pickens and Monica Pickens who testified to hearing gunshots as Pickens and Arrington were both still at the scene of the fight in apartment 4-A. They each testified that defendant Pickens then left to call 911. Defendant Pickens also called Raymond Curtis who lived in apartment 20-C and who testified that he saw defendant Arrington fire shots toward Building 18 and that Pickens was behind Arrington. Defendant Arrington presented witnesses who heard shots and at the same time saw Arrington at apartment 4-A rather than 18-B. One witness, Anna Galloway, saw Arrington at apartment 4-A, saw Pickens running up the hill and then heard gunshots.

The State presented evidence tending to show that one or both of the defendants was outside apartment 18-B and fired shots into that apartment. Defendants each attempted to respond to the State's case by putting on evidence that the other defendant, or some third person, was outside Building 18 firing shots. There was an irreconcilable conflict between defendants' evidence, and their defenses were antagonistic. We believe this is a case where the jury may well have inferred from the conflict alone that both defendants were guilty. See Nelson, 298 N.C. at 587, 347 S.E.2d at 640. Given the conflict in defendants' respective positions at trial and considering the other evidence in the case, including the paucity of evidence on acting in concert, we conclude that defendants were denied a fair trial by being tried together. Thus, a severance

is necessary to promote a fair determination of their guilt or innocence of the charged offenses. N.C.G.S. § 15A-927(c)(2) (1988).

We find it unnecessary to discuss defendants' remaining assignments of error as they are unlikely to recur at retrial. For the reasons stated above, this case is remanded to the Superior Court, Buncombe County, in order that each defendant may receive new and separate trials.

NEW TRIAL.