IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-460

Filed 2 July 2025

Chatham County, Nos. 18CRS051921-180; 19CRS000022-180

STATE OF NORTH CAROLINA

v.

JOSALYN RAHSHELL UPCHURCH

Appeal by Defendant from judgments entered 3 November 2022 by Judge Keith O. Gregory in Chatham County Superior Court. Heard in the Court of Appeals 9 April 2024.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Sherri Horner Lawrence, for the State-Appellee.*

*Joseph P. Lattimore for Defendant-Appellant.*

COLLINS, Judge.

Defendant Josalyn Rahshell Upchurch appeals from judgments entered upon a jury's guilty verdicts of first-degree murder under the felony murder rule and intentional child abuse inflicting serious bodily injury. Defendant asserts that the trial court erred by denying her motions to sever her trial from her co-defendant's trial and by admitting certain evidence. We find no error.

## I. Procedural History

Defendant and her co-defendant, Ricky Adams, were each indicted on one

count of first-degree murder and one count of intentional child abuse inflicting serious bodily injury stemming from the death of Defendant's one-year-old child, De'Andre. The State's motion to join the cases for trial was granted on 28 October 2019, over Defendant's objection, and the matter was set for trial on 12 July 2021. Defendant moved to sever her trial from Adams' trial on 28 June 2021. Prior to hearing Defendant's motion to sever, the trial court continued the trial due to Covid.

Defendant's motion to sever was heard on 30 August 2021. At the conclusion of the hearing, the State agreed to conduct a review pursuant to *Bruton v. United States*, 391 U.S. 123 (1968), for out-of-court statements made by either Defendant or Adams that directly referenced the guilt of the other party for the crimes charged. The State agreed that such statements would not be admitted during the State's case in chief absent consent of the party against whom it would be admitted. The trial court denied Defendant's motion to sever by order entered 12 October 2021.

Defendant renewed her motion to sever on 31 May 2022. The motion was denied. On 23 September 2022, in response to Defendant's motion to Prohibit Co-Defendant Ricky Adams' Extrajudicial Incriminating Statements,[1] the trial court ordered "that statements made by either defendant that '*I didn't do it*' or similar language, as well as statements that '*it must have been him/her*' are subject to *Bruton* and shall be redacted or otherwise not admissible."

---

[1] This motion does not appear in the record but is referenced in the order ruling on it.

Defendant renewed her motion to sever prior to trial on 26 September 2022. The motion was denied. Defendant and Adams were jointly tried. At the conclusion of all of the evidence and prior to final arguments, Defendant renewed her motion to sever. The motion was denied. After closing arguments were given and the jury charged, Defendant moved to sever and for a mistrial. The motion was denied.

The jury convicted Defendant of first-degree murder based on the felony murder rule and intentional child abuse inflicting serious bodily injury. The jury acquitted Adams of both charges. Defendant timely appealed.

## II. Factual Background

The evidence at the trial tended to show the following: Defendant gave birth to De'Andre in April 2016. Defendant, De'Andre, and De'Andre's father, Darius Cotton, resided at an apartment together until De'Andre was around 2-3 months old. Defendant had custody of De'Andre, and Cotton had him on alternating weekends.

On Sunday, 16 July 2017, Defendant had De'Andre and called Chatham County 911 at 1:48 p.m. for assistance. Officer Samuel Bradburn with the Pittsboro Police Department and John Burkett and Kenneth Perry with the Pittsboro Fire Department responded. When they arrived at the scene at 1:55 p.m., they found De'Andre lying on the floor while Defendant gave him emergency breaths. It was immediately obvious to the first responders that De'Andre was dead because he had no pulse, was cold to the touch, and his joints, wrists, and elbows were seized up. When Burkett placed an AED device on De'Andre to shock his heart back into normal

rhythm, it indicated "no shock was needed" because no pulse was detected. An EKG revealed no heart activity. As a result, the first responders did not perform CPR on De'Andre.

Defendant was not crying and was described by Burkett as not very emotional. Adams was sitting on the couch watching television. Burckett described Adams as acting "way more interested in what was going on on the TV than what was going on in the room." Defendant told the first responders that she had checked on De'Andre "around 12:00," and "he was unresponsive then."

## A. Alene Cameron's Testimony

Alene Cameron, a Paramedic Supervisor with FirstHealth with training and certification in cardiac life support, also responded to the scene because the 911 call was a cardiac arrest call. When she arrived, De'Andre had no pulse, was cool to the touch, and had a rigid jaw. She noticed that De'Andre was not "as flaccid as you would expect to find" a child who had gone into "a witnessed [cardiac] arrest." According to Cameron, this aligned with delayed reporting. Cameron told Defendant De'Andre was dead. Defendant leaned into Adams; she said she "felt numb" and "really didn't have any more questions."

Defendant told Cameron that she tried to give De'Andre some milk around 10:00 a.m. and then checked on him at 11:00 a.m. and 12:00 p.m. that day, but he did not want anything or was sleeping. Defendant then checked on him again, and that is when she called 911. Cameron noticed De'Andre had some bruising along his

abdomen, which did not appear to be a result of CPR, and a little mark above his right eye.

## B. Nick Victorino's Testimony

Nick Victorino, the county medical examiner, examined De'Andre's body at the scene. Victorino observed bruises on De'Andre's face and chest/abdomen, a swollen right eye, and discoloration behind the right ear. De'Andre was cold to the touch and undergoing rigor mortis. According to Defendant, De'Andre had been healthy and had nothing wrong with him. Defendant said she put De'Andre to bed around 10:30 p.m. the night before; when she went into his room to check on him around 12:00 a.m., he was sleeping. Defendant heard De'Andre on the baby monitor moving around at 2:00 a.m., but he went back to sleep.

Defendant went into his room at 10:00 a.m. to try to feed him, but he did not want anything and went back to sleep. Defendant checked on De'Andre at 12:00 p.m.; she found him sleeping on his back and attempted to feed him again. At 1:40 p.m., Defendant went in and found De'Andre cold and unresponsive. Defendant stated De'Andre's diaper had been changed the evening before. Victorino noted De'Andre's diaper was lightly soiled with no odor.

Adams told Victorino that De'Andre had been put to bed at 10:30 p.m. or 11:00 p.m. Defendant woke him up yelling that she needed help because De'Andre was ill.

## C. Officer Bradburn's Testimony

Defendant told Officer Bradburn that she put De'Andre to bed at 10:30 p.m.,

checked on him around midnight, and woke up around 10:00 a.m. and tried to feed De'Andre, but he would not eat. She put De'Andre back to bed, checked on him around 12:00 p.m. and then again right before she called 911. Defendant stated she found De'Andre in the bed and put him on the living room floor to attempt CPR. Officer Bradburn noticed Defendant was talking calmly and clearly, but seemed slightly flustered.

### D. Gene Harris's Testimony

EMT Gene Harris, Jr., overheard Defendant give a timeline of the events leading up to her calling 911. She said she checked on De'Andre at 10:00 a.m. to attempt to feed him, but he did not want food. She checked on him again at noon. Defendant stated De'Andre was "cold as bricks" when she checked on him at 1:00 p.m. According to Harris, Defendant was calm, was not crying, and seemed traumatized, in shock, or indifferent.

### E. Darius Cotton's Testimony

Defendant called Cotton, and his wife, Melissa, at around 1:55 p.m. on 16 July 2017 to tell them they needed to get to her house because De'Andre was cold and unresponsive. According to Cotton, Defendant sounded worried and frantic. Defendant said De'Andre wasn't sick. Defendant told them she laid De'Andre down for a nap and he was "cold as ice" when she went to check on him.

When Cotton and Melissa had De'Andre the weekend before, he was healthy and did not have any injuries. De'Andre usually woke up at 4:30 a.m. or 5:00 a.m. to

play or for a bottle, went back to sleep around 7:30 a.m. or 8:00 a.m., and then woke up no later than 9:30 a.m. De'Andre never slept until 11:00 a.m. or 1:00 p.m.

On 31 May 2017, about six weeks before De'Andre's death, Defendant posted on her Facebook page, "If this son of mines headbutt me in my breasts 1 more time imma throw him into the wall! What in the world is wrong with him[.]"

## F. Detective Delanie Womack's Testimony

Detective Delanie Womack of the Pittsboro Police Department was the lead detective assigned to the investigation into De'Andre's death. She interviewed Defendant on 18 July 2017, 26 July 2017, and 15 March 2018. Defendant was also interviewed by the SBI on 1 August 2017. Defendant's story of the events leading up to De'Andre's death changed in each interview.

Detective Womack noted significant changes in Defendant's statement about who laid De'Andre down on 15 July 2017. Initially, Defendant wrote in her statement and stated in her first interview that she put De'Andre to bed that night. In her last interview, Defendant for the first time stated that she was sure Adams put De'Andre to bed that night.

On 26 July 2017, Defendant told Detective Womack that she heard a noise on the monitor at 12:00 a.m. and went to check on De'Andre; he was fine. Around 1:00 a.m. or 1:30 a.m., she checked on De'Andre and changed his diaper. Defendant later told Detective Womack in the second interview that she got up around 12:00 a.m., checked on De'Andre because she heard a noise on the monitor and changed his

diaper at the same time, rather than doing it separately at 1:00 a.m.

Adams told Detective Womack that he left Defendant and De'Andre at the apartment around 6:30 p.m. to go to Durham and returned around 9:00 p.m. Adams changed De'Andre's diaper, and Defendant later put De'Andre to bed. Adams had seen Defendant hit De'Andre on the leg or hand, but he did not see anything that night. Defendant often stated De'Andre was clingy and spoiled and that people needed to stop holding him.

## G. Dr. Susan Venuti's Testimony

Dr. Susan Venuti, associate chief medical examiner with the Office of the Chief Medical Examiner, testified as an expert in forensic pathology. Dr. Venuti performed De'Andre's autopsy and observed multiple injuries: three rib fractures with hemorrhaging, six distinct bruises to the stomach/abdomen area, a large liver laceration, abdominal cavity bleeding, two bruises on the top of his head corresponding to the hemorrhaging in the periosteum, hemorrhaging in the adrenal glands, bruising on the right side of his face from his chin to just above his right eye, contusions like a black eye under his right eye with a slight amount of edema, an abrasion on the lateral right eyebrow, bruising behind the ear, cheek bruising, bruising along and below the costal margin where the ribs end on the right side of the body, bruising in the middle of the chest nipples (below the xiphoid or below the rib in the middle), bruising in the abdomen, a pressure mark on the right side of the body, and petechiae in lower eyelid of the right eye. When De'Andre was found, his

jaw was locked and his arms and legs were stiffening up, indicating rigor mortis, which normally starts within a couple of hours of death.

Dr. Venuti opined that De'Andre's cause of death was blunt force trauma to the chest and abdomen, and the manner of death was homicide. Dr. Venuti opined that based on De'Andre's chest and abdomen injuries, his death may have been caused by one or multiple recent impacts in the abdomen. Dr. Venuti stated that the liver laceration injury "would require a pretty significant amount of force." Dr. Venuti equated the amount of force needed to cause De'Andre's liver laceration to "injuries that we typically would see in motor vehicle crashes where there is a large impact stopping at a high rate of speed." Dr. Venuti also equated the significant amount of force needed to cause a liver laceration injury like De'Andre's to a heavy and large older-generation television falling on top of a child. Dr. Venuti opined that the presence of rigor mortis in the jaw and extremities indicate that the child was deceased when emergency personnel arrived.

## III.    Discussion

### A. Joint Trial

Defendant first argues that the trial court erred by denying her motions to sever her trial from Adams' trial.

North Carolina "has a strong policy of favoring consolidated trials of defendants accused of collective criminal behavior." *State v. McKeithan*, 140 N.C. App. 422, 430 (2000) (citation omitted). N.C. Gen. Stat. § 15A-926(b)(2)(a) "authorizes

joinder of defendants where the state seeks to hold each defendant accountable for the same crimes[.]" *State v. Rasor*, 319 N.C. 577, 581 (1987). "The propriety of joinder depends upon the circumstances of each case and is within the sound discretion of the trial judge." *State v. Pickens*, 335 N.C. 717, 724 (1994). "Absent a showing that a defendant has been deprived of a fair trial by joinder, the trial judge's discretionary ruling on the question will not be disturbed." *State v. Nelson*, 298 N.C. 573, 586 (1979) (citations omitted). Nevertheless, pursuant to N.C. Gen. Stat. § 15A-927(c)(2), "the trial court must deny a joinder for trial or grant a severance of defendants whenever it is necessary to promote a fair determination of the guilt or innocence of one or more defendants." *Pickens*, 335 N.C. at 724.

"The existence of antagonistic defenses will not, standing alone, warrant a severance." *Id.* at 725 (citation omitted). "On the other hand, the fact that the evidence may be substantial against a defendant will not preclude severance where joinder denies a defendant a fair trial." *Id.* (citations omitted). "The test is whether the conflict in defendants' respective positions at trial is of such a nature that, considering all of the other evidence in the case, defendants were denied a fair trial." *State v. Lowery*, 318 N.C. 54, 59 (1986) (quoting *Nelson*, 298 N.C. at 587).

### 1. *Antagonistic Defenses*

Defendant argues that "[t]he defenses in this case were diametrically opposed to one another," as illustrated by the defendants' respective closing arguments. Defendant's counsel told the jury, "If you believe that there has been proof beyond a

reasonable doubt of who committed a crime, that somebody is Ricky Adams . . . ." Adams' counsel, on the other hand, told the jury that Adams was in Durham when Defendant inflicted De'Andre's injuries. While each defendant sought to implicate the other, such a potential for "finger pointing" does not necessitate separate trials. *See, e.g., State v. Harrington*, 171 N.C. App. 17, 22-23 (2005) (holding the trial court did not err in joining defendants' cases for trial even where "each of their defense counsel had to deflect blame from his respective client by casting blame on the other" while examining witnesses); *Lowery*, 318 N.C. at 60-61 (rejecting misjoinder claim even though both defendants denied involvement in the crime and the strategy employed by the attorney for one defendant was to suggest the other defendant killed the victim); *State v. Cook*, 48 N.C. App. 685, 687 (1980) (holding joinder was proper in homicide trial even where "only one defendant logically could have fired the fatal shots"). Here, even with a conflict in defendants' respective positions, considering all the evidence at trial, Defendant has failed to show she was deprived of a fair trial.

### 2. *Conflicting evidence*

Defendant also argues that "[i]n terms of the evidence at trial, there was a high degree of conflict between the defenses." Defendant points to the cross-examination of Burkett as an example of this conflict. There, Defendant elicited testimony that when Burkett arrived on the scene, Adams did not appear engaged in any life-saving activities and was more engaged in the television than what was going on with the child. Adams elicited testimony that when Burkett arrived on the scene, Defendant

wasn't crying or screaming and appeared oddly calm.  These cross-examinations do not illustrate conflict between the defenses, much less a high degree of conflict.

### 3.  *Discretionary ruling*

Defendant next argues that the trial court erred as a matter of law by denying her motion to sever because "[t]he judge's comments show that . . . he did not believe he had the discretion to revisit the earlier decision of another judge made before trial." Defendant mischaracterizes the trial court's ruling.

In response to Defendant's motion to sever made at trial, the trial court ruled as follows:

> Mr. Silverman, you -- you mentioned *Melvin*.  It's very interesting.  I think that -- I agree that the [c]ourt, with the dynamic of a trial, the -- the judges that ruled beforehand, when they are not boots on the ground during the trial, things happen in the trial that can cause maybe that same judge that ruled then to have a different approach at the time the game is actually going on.
>
> That being said, I didn't rule before.  I was not a part of that.  I'm boots on the ground.  And even being boots on the ground, I still feel respectfully that even with -- as you said with *Melvin*, the [c]ourt can make -- still -- decisions; but I still stick to that I don't believe it would be appropriate, based on even the dynamics of this case, for this [c]ourt to step out and say, "Well, I'm going to change a motion to join respectfully."

In this ruling, the trial court acknowledged that prior judges had denied Defendant's motion to sever and that he was not involved in those decisions.  The trial court also acknowledged that things can happen in a trial after such a ruling

that would cause a judge to have a different approach. The trial court then explained that he was presently involved in the case – "I'm boots on the ground" – and that, based on "the dynamics of the case," he was still going to deny the motion to sever. Contrary to Defendant's argument, nothing in these remarks indicates that the trial court "did not believe he had the discretion to revisit the earlier decision of another judge made before trial."

### 4. *Preclusion of evidence*

Defendant next argues that there were several times where Defendant's evidence was erroneously precluded because of the trial court's concerns with protecting Adams' rights.

#### a. *Adams showed a gun*

Defendant first argues that the trial court erred by excluding certain evidence she sought to elicit on the cross examination of Cotton where Adams objected but the State did not. This is not an accurate reflection of the transcript.

Defendant attempted to elicit that Adams showed Cotton a .45 caliber handgun just before De'Andre's funeral. Both Adams and the State immediately objected, and the jury was asked to step out of the court room. At that point, the State said, "And, Your Honor, I wasn't clear if the [c]ourt heard that the State also lodged an objection to that." The trial court responded, "Yes." The State then reiterated, "There is a lot going on. I just wanted the record to be clear that the State also objected to elicitation -- to the eliciting of the information about the gun." The trial court responded, "All

right. Let me -- and that record --the record shall reflect that." Adams explained his objection was because of the evidence's potential to "associate him with a violent firearm." The State explained that it did not elicit that information "because with the context, it did not appear to be relevant to any particular material fact."

Defendant's assertion that the State did not object to the testimony is simply not accurate. Furthermore, Defendant's assertion that she "probably could have gotten that in[to evidence]" is unsupported. Defendant makes no argument as to why this evidence was relevant and would have been admissible at trial had Defendant been tried separately. *See* N.C. Gen. Stat. § 8C-1, Rule 401 (2021) ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); *id.* § 8C-1, Rule 402 (2021) ("Evidence which is not relevant is not admissible."). Accordingly, the trial court's exclusion of this evidence was not erroneous, and Defendant's argument thus lacks merit.

b. *Defendant's statements*

Defendant next argues that, as a result of the trial court's *Bruton* ruling, Defendant was prevented from offering portions of her statements made to Detective Womack.

Detective Womack interviewed Defendant several times between 18 July 2017 and 15 March 2018. At trial, Detective Womack testified to the general contents of those interviews and to a timeline of events she constructed from those interviews.

Recordings redacted to comply with the *Bruton* rulings were played for the jury. Defendant contends that she was precluded from introducing the following statements: Detective Womack noted in her report that "[Defendant] then looked at me and put her hand on her chest while stating, 'I don't -- I mean, I know I didn't do anything, so I don't know what could have been the cause of that. I don't have any idea.'" Detective Womack also noted, "I then ask[ed] [Defendant] how De'Andre got all the injuries listed; and she stated, 'I don't know. I didn't do it.'" Counsel for Defendant also pointed out that, on multiple other occasions, Defendant told Detective Womack, "I didn't abuse my child" and "I don't put nothing past nobody."

Defendant has failed to show how these statements were admissible. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2021). "Hearsay is not admissible except as provided by statute or by these rules." *Id.* § 8C-1, Rule 802 (2021). Defendant fails to argue why these statements are not hearsay or point to an exception that would allow their admission. Although these statements could potentially have come into evidence to corroborate her in-court testimony, Defendant did not testify at trial and makes no argument that she would have taken the stand had she been tried separately. Accordingly, Defendant has failed to show that she was prevented from offering portions of her statements "as a result of" the trial court's *Bruton* ruling.

**5. *Summary***

Defendants arguments as to why the trial court erred by denying her motion to sever her trial from Adams' trial lack merit. Defendant has failed to show that the conflict in defendants' respective positions at trial were "of such a nature that, considering all of the other evidence in the case," Defendant was "denied a fair trial." *Lowery*, 318 N.C. at 59 (citation omitted). For these reasons, we reject Defendant's argument that the trial court erred by denying her motions to sever.

**B. Character Evidence**

Defendant next contends that the trial court erred by admitting character evidence that Defendant cheated on Cotton while she was pregnant with De'Andre. Defendant specifically argues that she did not open the door to that evidence.

"Evidence of a person's character or trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion[.]" N.C. Gen. Stat. § 8C-1, Rule 404(a) (2021). However, a trial court may admit otherwise inadmissible evidence "if the opposing party opens the door through cross-examination of the witness." *State v. Thaggard*, 168 N.C. App. 263, 273 (2005) (citation omitted). "'Opening the door' is the principle where one party introduces evidence of a particular fact and the opposing party may introduce evidence to explain or rebut it, even though the rebuttal evidence would be incompetent or irrelevant, if offered initially." *Id.* (citation omitted). "A trial court's decision to admit or exclude evidence to which a party has opened the door is subject to review on appeal for abuse of discretion." *State v. McKoy*, 385 N.C. 88, 97 (2023).

Here, during the State's direct examination of Cotton, the State played a video recording of him being interviewed by a detective. Before it was played, the parties agreed to redact his comment to the investigators that Defendant "had sex in our house . . . in our bed while she was pregnant with De'Andre."

On cross examination, Defendant asked, "Did you say during the course of that interview that [Defendant] had been a good woman to you?" Cotton responded, "I guess, yes." Defendant then asked, "And had she been a good woman to you?" Cotton responded, "Yes." On redirect examination, the State asked, "So what happened in your relationship that caused you to end the relationship, understanding all of that that had gone before?" Cotton responded, "She - - she told me that she had slept with someone else while she was pregnant with De'Andre in our home."

By asking Cotton, "And had she been a good woman to you?" Defendant "opened the door" to the State's rebuttal evidence she now challenges. Accordingly, the trial court did not abuse its discretion in overruling Defendant's objection and admitting the evidence.

## C. Hearsay

Defendant next argues that the trial court erred by admitting Cotton's pre-trial statements that he did not believe Defendant's version of events. Defendant specifically argues that the statements were inadmissible hearsay. The State, on the other hand, argues that the challenged statements were properly admitted to corroborate Cotton's trial testimony.

"When preserved by an objection, a trial court's decision with regard to the admission of evidence alleged to be hearsay is reviewed *de novo*." *State v. Johnson*, 209 N.C. App. 682, 692 (2011). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c). Hearsay is not admissible except as provided by statute or by the Rules of Evidence. *Id.* § 8C-1, Rule 802.

"Prior statements admitted for corroborative purposes are not hearsay because they are not offered for the truth of the matter asserted." *State v. Lindsay*, 292 N.C. App. 641, 650 (2021). "Corroborative testimony is testimony which tends to strengthen, confirm, or make more certain the testimony of another witness." *Id.* (citations omitted). "To be admissible as corroborative evidence, prior consistent statements merely must tend to add weight or credibility to the witness's testimony." *Id.* (quotation marks and citations omitted). "[S]uch corroborative evidence may contain new or additional facts when it tends to strengthen and add credibility to the testimony which it corroborates." *Id.* (citations omitted).

At trial, Cotton testified that he had expressed concerns to law enforcement about information Defendant had told him regarding De'Andre's death. He was concerned that the things Defendant told him "were changing as far as her account of what happened." Cotton testified that Defendant told him over the phone when he was on the way to the apartment that "[s]he had laid him down for a nap. And when

- 18 -

she went back to get him up, he was cold and unresponsive." He testified, "'Cold as ice' is her words." Defendant calmly told Cotton's wife that De'Andre was dead. Cotton did not talk to Defendant between the time of De'Andre's death and his funeral when Cotton "was still under the impression that she put him down for a nap and when she went back to check on him or get him up, he was cold and unresponsive."

The video of Cotton's interview with Detective Womack was introduced to corroborate his in-court testimony. As articulated by the State in response to Defendant's objection to the evidence at trial, Defendant's recitation of objected-to statements indicated that "the video and the live testimony of Mr. Darius Cotton were almost perfectly consistent with each other." Moreover, the portions of the objected-to video that were not "almost perfectly consistent with" the live testimony still "tend[ed] to add weight or credibility" to Cotton's testimony. *Id.* Accordingly, the evidence was not hearsay, and the trial court did not err by allowing its admission.

## IV. Conclusion

For the foregoing reasons, we find no error.

NO ERROR.

Judges HAMPSON and CARPENTER concur.